**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA,<br><br>        *Plaintiff,*<br><br>v.<br><br>VISA INC.,<br><br>        *Defendant.* |

Case No. 1:24-cv-07214-JGK-SLC

## MEMORANDUM OF LAW IN SUPPORT OF VISA INC.'S MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

I.      DEBIT PAYMENTS OVERVIEW ............................................................ 3

II.     THE ALLEGED MARKET ....................................................................... 4

        A.      Included Payment Methods ............................................................ 5

                1.      Front-Of-Card Networks .................................................... 5

                2.      PIN Networks .................................................................... 6

                3.      "Fintech Debit Networks" ................................................. 7

        B.      Excluded Payment Method: Interbank Payment Networks ........... 8

III.    ALLEGED ANTICOMPETITIVE CONDUCT ........................................ 9

        A.      Volume-Based Agreements ........................................................... 9

        B.      "Agreements Not To Compete" ................................................... 10

LEGAL STANDARD ........................................................................................... 11

ARGUMENT ....................................................................................................... 12

I.      THE    GOVERNMENT'S    ALLEGED    PRODUCT    MARKET    IS
        IMPLAUSIBLE .................................................................................... 12

        A.      The Government Cannot Exclude a Product for Lacking Certain
                Features ..................................................................................... 12

        B.      The Government's Market Allegations Are Self-Contradictory ... 14

II.     THE    GOVERNMENT    FAILS    TO    ALLEGE    ANTICOMPETITIVE
        CONDUCT ........................................................................................... 17

        A.      The Government's Volume-Discount Claims Fail as a Matter of
                Law Because It Has Not Alleged Below-Cost Pricing ................. 18

        B.      The    Government's    "Agreement-Not-To-Compete"    Claims    Fail
                Because They Ignore the Explicit Language of the Agreements ... 20

                1.      Apple Agreements ............................................................ 21

2.     PayPal Agreement..................................................................24

3.     Square Agreement.................................................................25

CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJ Energy LLC v. Woori Bank*,
2019 WL 4688629 (S.D.N.Y. 2019) .......................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................... 11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................ 18, 19

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ............................................................................. 18, 20

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ...................................................................................... 21

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) ..................................................................................... 18

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ................................................................................... 19

*Dream Big Media v. Alphabet Inc.*,
2024 WL 3416509 (N.D. Cal. 2024) ......................................................................... 21

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010) ...................................................................................... 21

*Fisk v. Letterman*,
401 F. Supp. 2d 362 (S.D.N.Y. 2005) ....................................................................... 14

*GateGuard, Inc. v. Amazon.com Inc.*,
2023 WL 2051739 (S.D.N.Y. 2023) .......................................................................... 16

*Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ............................................................................ 14

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ................................................................................... 13

*In re Google Digit. Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ....................................................................... 21

*In re Livent, Inc. Noteholders Secs. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ....................................................................... 14

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .............................................. 13

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547 (S.D.N.Y. 2017) ..................................... 14

*Mathias v. Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001) .............................. 13, 14

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
  889 F.2d 524 (4th Cir. 1989) ................................................ 13

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) .............................................. 21

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) .......................................... 18, 19, 22, 23

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
  96 F.4th 327 (2d Cir. 2024) ........................................... 12, 13

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
  547 F. Supp. 2d 1086 (C.D. Cal. 2007) ................................. 13

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. 2019) ........................................ 20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ............................................................ 22

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ............................................................ 19

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................ 20

**Statutes**

*Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203,
  124 Stat. 1376 (2010)............................................................ 4

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: *An Analysis of Antitrust
  Principles and Their Application* (5th ed. 2024) ............... 19, 20

## **INTRODUCTION**

The Government seeks to intervene in a thriving industry. There is no shortage of well-resourced, sophisticated players in a payments industry that includes Visa, Mastercard, American Express, Discover, Apple, PayPal, and Square. And it shows. Competition has driven technological innovations—like digital wallets, tokenization, and smart chips—that have changed the way consumers make purchases, making cash almost a relic of the past.

Visa competes every day to keep pace with this change. Calling Visa a mere "middleman" collecting transaction fees, as the Government does in its Complaint, makes for good headlines. But it fails to recognize that Visa has played an integral role in many of the innovations that have made debit among the most attractive payment methods in the country. This effort has benefited Visa because it is good business. But it has also made debit secure, rapid, and reliable for consumers and merchants.

So, after investigating Visa's debit business for years, what does the Government do? It asks this Court to prohibit the precise conduct that the antitrust laws are designed to promote. It seeks to stop Visa from offering volume-based discounts that merchants demand and that are ubiquitous across the industry. And it insists that Visa should forgo its right to stop sharing its proprietary technology—technology that Visa innovated and continues to develop—if its partners decide to become competitors by building their own payment networks.

The Court should decline to entertain these requests and should dismiss this case. The Government's allegations fail to state a claim that Visa has done anything to violate the antitrust laws. The Government's only real complaint is that Visa is big, but size alone is not a violation of the antitrust laws.

First, the Government's claims fail because it implausibly excludes a competing category of debit networks based on threadbare allegations riddled with internal contradictions. Interbank

Payment Networks, such as the Automated Clearing House (ACH), meet the Government's own market definition: they indisputably "facilitate the debit (i.e., withdrawal) of funds out of a consumer's bank account, often using a credential or other account number." The Government, in fact, includes in its alleged market other debit products that utilize ACH to facilitate fund transfers. And the Government even alleges that these sorts of ACH-based payment networks represent an "existential" competitive threat to Visa's debit business. Yet, the Government simultaneously alleges that ACH and all other Interbank Payment Networks are somehow not part of the relevant market. The Court should not permit this market gerrymandering.

Second, the Government improperly seeks to hold Visa liable for providing merchants volume-based discounts. As the Supreme Court has instructed, price discounts should rarely be subjected to antitrust scrutiny because of the risk of chilling price cuts. Accordingly, courts follow predictable well-defined rules to evaluate discounts that impose liability only when price cuts are predatory—that is, where the company sets below-cost prices to drive out competition. The Government's volume-based discount claims fail because it has not alleged, and cannot allege, that Visa sets its prices below cost.

Third, the Government is wrong that Visa has entered "agreements not to compete" with Apple, PayPal, and Square. The Government relies exclusively on Visa's written contracts to support its claim that Visa prohibits these companies from introducing competing debit networks. But a review of those contracts makes plain that Visa has done nothing of the sort. At most, Visa merely protects its right to withhold its technology from competitors, a right essential to promoting investment in innovation.

## BACKGROUND[1]

### I.    DEBIT PAYMENTS OVERVIEW

The payments industry is evolving rapidly. A consumer can choose from an ever-expanding array of payment methods—including cash, check, credit cards, debit cards, interbank transfers, prepaid cards, and digital wallets. Most of these methods can be used in person or online.

The Government focuses on debit, which has become more popular as consumers move away from cash. *See* Compl. ¶¶ 6–27, 37, 111. Debit allows a consumer to pay for goods or services by transferring funds directly from the consumer's bank account, as opposed to another funding source (such as a line of credit). *Id.* ¶ 27.

Broadly speaking, five entities are involved in debit transactions: the consumer; the consumer's bank; the merchant; the merchant's bank; and the debit network. Compl. ¶¶ 28–37, 108 fig. 3. The consumer's bank is called the "issuer," and the merchant's bank is called the "acquirer." For clarity, this memorandum refers to them as the "consumer's bank" and the "merchant's bank." The debit network, such as Visa or Mastercard, facilitates fund transfers from the consumer's bank to the merchant's bank, including by providing the "rails" allowing the banks to communicate with one another. *Id.* ¶¶ 31–32.

Some debit transactions involve use of a debit card issued by the consumer's bank. Compl. ¶¶ 30, 60. Debit networks contract with the bank to be enabled on the card. *Id.* When a network is enabled on a card, the merchant can use that network to complete a transaction—provided the merchant also accepts that network.

---

[1] This motion relies on the Government's allegations, many of which are inaccurate.

The "Durbin Amendment," passed in 2010, requires every debit card to enable at least two unaffiliated networks. Compl. ¶ 8; *Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Thus, each Visa-branded card must have a non-Visa network enabled.

## II.    THE ALLEGED MARKET

This case is about debit networks. Visa and Mastercard are well-known debit networks but there are many more. The Government identifies four types of debit networks:

- **"Front-of-Card Networks"**: These are the brands, like Visa and Mastercard, that banks graphically display on the front of cards. Compl. ¶ 34.

- **"PIN Networks"**: Banks typically put PIN Networks—such as STAR, NYCE, Pulse, Interlink, or Maestro—as the unaffiliated network on their cards. *Id.* ¶¶ 34, 41.

- **"Interbank Payment Networks"**: These networks—which include the ACH Network, the Real-Time Payments (RTP) Network, and FedNow—also facilitate direct consumer-to-merchant transfers. *Id.* ¶¶ 60–61, 159. They use a consumer's bank account number rather than a debit card credential. *Id.*

- **"Fintech Debit Networks"**: These are networks created by technology companies that utilize Interbank Payment Networks to facilitate direct consumer-to-merchant payments. *Id.* ¶¶ 60–61, 108, 117.

Each network is described in more detail below.

The Government alleges that the relevant markets in this case are (1) general purpose debit network services and (2) general purpose card-not-present debit networks services. Compl. ¶ 151. According to the Government, the card-not-present market, which primarily consists of "e-commerce transactions," is "best understood" as a "submarket" of the general purpose market. *Id.* ¶ 161.

In defining the relevant product markets, the Government focuses on debit's facilitation of direct payments from a consumer's bank account. The Government defines its debit-network

market as "products and services that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account, often using a credential or other account number to identify the consumer." Compl. ¶ 152.

The Government includes three network types in its alleged product markets: Front-of-Card Networks; PIN Networks; and Fintech Debit Networks. Compl. ¶ 152. But it excludes Interbank Payment Networks even though they meet the Government's definition of a debit network: facilitating payments directly from a consumer's bank account. *Id.* ¶¶ 152, 159. Notably, the Government includes Fintech Debit Networks even though they commonly rely on excluded Interbank Payment Networks to transfer funds. *Id.* ¶ 61.

### A.    Included Payment Methods

The Government alleges that the debit networks included in its alleged market have different features and capabilities. Importantly, the Government excludes Interbank Payment Networks from its alleged market for allegedly lacking features and capabilities that some of the included networks similarly lack.

### 1.    Front-Of-Card Networks

Visa, Mastercard, American Express, and Discover are referred to as Front-of-Card Networks because banks typically put these brands on the front of their debit cards. Compl. ¶ 34.

Front-of-Card networks invest heavily in their debit networks and brands, including by developing algorithms and other technologies used for fraud detection. While the Government notes that Visa considers its "speed and accuracy at identifying fraud" to be unmatched, Compl. ¶ 105, the Government ignores Visa's many innovations and investments in this area.

Visa and Mastercard have also developed technology allowing transactions to remain secure even when the debit card is not physically presented at the point of sale, such as with online

transactions. Again, the Government does not describe these innovations in detail. But it notes that Visa and Mastercard developed tokenization technology, which replaces debit credentials to improve security when a physical card is not present. Compl. ¶¶ 58, 143.

### 2.    PIN Networks

The Complaint references a few of the many PIN Networks: Interlink, Maestro, Pulse, STAR, and NYCE. Compl. ¶¶ 41, 47. Interlink, Maestro, and Pulse are owned respectively by Visa, Mastercard, and Discover, while STAR and NYCE are owned respectively by Fiserv and FIS, two large payment processors. These networks are referred to as "back-of-card" because their brands do not typically appear on the front of the cards on which they are enabled.

PIN Networks do not offer "fraud protections equivalent" to Visa and Mastercard. Compl. ¶ 105. As noted, PIN Networks generally utilize repurposed ATM rails. *Id.* ¶¶ 46–47. Like their ATM ancestors, PIN Networks mostly rely on PIN entry to prevent fraud. *Id.* ¶ 6. PIN Networks recently created PINless processing that does not require PIN entry. *Id.* ¶ 56. But merchants and banks are skeptical of the security offered by PINless processing, leading PINless transactions to be capped at a "certain dollar amount." *Id.* ¶ 58.

For this and other reasons, there are instances where PIN Networks cannot be used. The Complaint identifies some instances: transactions over a certain amount; transactions that fail to meet required security criteria; transactions where the merchant did not ask for the consumer to enter a PIN; and transactions where the consumer declined to enter a PIN when prompted. Compl. ¶¶ 58, 80. The Government alleges that about half of debit transactions cannot be processed by PIN Networks. *Id.* ¶ 73.

The Government refers to these as "non-contestable" transactions, Compl. ¶¶ 10, 58, 80, but these transactions are only "non-contestable" because PIN Networks have not built the

capability to process them or because users of those networks (consumers, merchants, and banks) have elected not to do what is necessary to enable the PIN Networks. For example, the Government alleges that online transactions over a certain amount are "non-contestable" because the PIN Networks have not developed sufficient fraud protection to securely process transactions of that size. But this is not an indication that competition is broken—just that a competitor (the PIN Network) lost that competition. As the Government admits, other companies (like Mastercard) have networks that can process all debit transactions. *Id.* ¶ 73.

### 3. "Fintech Debit Networks"

The Government identifies "Fintech Debit Networks," created by technology companies, like PayPal, as a way consumers make debit purchases without using a debit-card credential. Compl. ¶¶ 60–62. Fintech Debit Networks do not operate their own payment rails; instead, they use Interbank Payment Networks like ACH and RTP to transfer funds. *Id.* ¶ 61. But the Government alleges that Fintech Debit Networks—unlike Interbank Payment Networks—are a viable alternative to other debit networks because they "provide additional capabilities like payment guarantee[s] for merchants, dispute resolution and chargeback services, and fraud protections." *Id.* ¶ 113. Again, the Government provides no further substantive details about these features.

Instead of being enabled on a debit card, Fintech Debit Networks are typically included as a payment method in a "digital wallet." Compl. ¶ 109. There are two types of digital wallets. A "pass-through digital wallet," such as Apple Pay, stores payment credentials (*e.g.*, debit-card numbers) that can be used directly to make purchases. *Id.* A "staged digital wallet," such as Square's Cash App or PayPal, allows customers to transfer funds from a checking account to the wallet, store the funds, and pay a merchant with those preloaded funds. *Id.*

Not all payment methods included in a digital wallet are Fintech Debit Networks, as the Government defines them. For example, when a consumer uses debit-card credentials stored in a digital wallet, that is not a Fintech Debit Network transaction. Instead, a Fintech Debit Network transaction occurs whenever a digital wallet performs a consumer-to-merchant transaction utilizing an Interbank Payment Network (like ACH or RTP) rather than a debit-card network.

### B.     Excluded Payment Method: Interbank Payment Networks

In addition to excluding other payment methods (like credit cards) from its alleged market, the Government excludes Interbank Payment Networks. These networks enable direct fund transfers from a consumer's bank account, thereby providing the functionality required by the Government's market definition. The Clearing House and Federal Reserve have developed Interbank Payment Networks for use in the United States. Compl. ¶ 159. These services include ACH networks, the RTP network, and the FedNow network. *Id.*

The Government concedes that Interbank Payment Networks are "lower-cost alternatives to Visa's debit offering." Compl. ¶ 61. It also concedes that Fintech Debit Networks—which it *includes* in its alleged market—utilize Interbank Payment Networks to execute consumer-to-merchant transactions. *Id.* ¶¶ 156, 159. Nonetheless, it alleges that Interbank Payment Networks are not a "viable alternative to debit" for two reasons. *Id.* ¶ 159.

First, the Government alleges that these Interbank Payment Networks are "inconvenient" for merchants because some of the services can take "two to three days to determine whether a payment is successful." Compl. ¶ 159. But it admits that this is not true of all Interbank Payment Networks: RTP and FedNow are "instant payment services." *Id.*

Second, the Government alleges that the Interbank Payment Networks are not a viable alternative (despite merchants making them available as a payment option) because they lack

8

"fraud detection, dispute resolution, and chargeback services." Compl. ¶ 159. But the Government alleges almost nothing else about these features in its seventy-page Complaint and nowhere explains why the debit networks the Government alleges also lack these features are nevertheless included in its alleged market. *E.g.*, *id.* ¶ 105.

## III.    ALLEGED ANTICOMPETITIVE CONDUCT

The Government alleges that Visa has monopolized the debit network markets and hampered competition by (1) entering volume-based routing agreements with merchants, merchant's banks, and consumer's banks, and (2) entering "agreements not to compete" with competitors and potential competitors.

### A.    Volume-Based Agreements

When a consumer uses a debit card, the merchant (or its bank) chooses which enabled network to use to process the transaction. Compl. ¶ 35. For example, if the consumer uses a Visa-branded card, the merchant (or its bank) could choose to use Visa or a back-of-card network (*i.e.*, a PIN Network).

A debit network may enter a "routing agreement" with a merchant (or its bank) relating to the merchant's debit-network selection. As part of these routing agreements, the debit network typically offers financial incentives that effectively lower the transaction fees on the merchant's transactions, based on the volume of transactions "routed" through the network. Compl. ¶¶ 43, 76.

Put otherwise, the Government alleges that Visa's routing agreements are unlawful because they give merchants the same volume-based discounts that buyers in many competitive industries

demand: Visa applies lower transaction fees if the merchant routes more transactions through Visa's network.

**B.    "Agreements Not To Compete"**

The Government alleges that Visa has entered unlawful "agreements not to compete" with Apple, PayPal, and Square (which it calls "fintechs"). The Government alleges that Visa has paid these companies not to launch their own Fintech Debit Networks. Compl. ¶ 196. There are four written agreements, which are incorporated into the Complaint by reference and attached here as exhibits. None prohibits the introduction of a Fintech Debit Network.

**Apple Technology Agreement.** The Apple Technology Agreement █████████ ███████████████████████ When Apple sought to launch Apple Pay (its digital wallet), Visa agreed to █████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████ This Agreement anticipates that Apple may ██████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████ The Government alleges that Visa shares "monopoly profits" with Apple. Compl. ¶ 136. █████████ █████████████████████████████

**Apple Merchant Agreement.** The Apple Merchant Agreement is separate from the Apple Technology Agreement (and was negotiated at a different time). This Agreement is a ██████ ██████ merchant routing agreement, ██████████████████████: Visa offers Apple financial incentives and discounts ██████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

████████ The Government, as noted, alleges that Visa pays Apple not to launch an alternative debit system that utilizes Interbank Payment Networks in Apple Pay. But the Apple Merchant Agreement ████████████████████████████████████████████

████████████████████████████████████████████

**PayPal Agreement.** PayPal and Visa have a "Strategic Partnership Agreement" ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ The agreement does not include terms restricting PayPal's ability to compete with Visa by launching its own Fintech Debit Network; indeed, PayPal has already done so.

**Square Agreement.** Visa's agreement with Square ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ The agreement does not include terms restricting Square's ability to compete with Visa.

## **LEGAL STANDARD**

A complaint cannot survive a motion to dismiss under Rule 12(b)(6) if it fails to contain "sufficient factual matter" to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

## ARGUMENT

## I.  THE GOVERNMENT'S ALLEGED PRODUCT MARKET IS IMPLAUSIBLE

"To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plausibly allege that the defendants' anticompetitive conduct restricted competition within a relevant market." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024). Because the Government fails to allege plausible relevant markets, the Complaint must be dismissed in its entirety.

More specifically, the Government's exclusion of Interbank Payment Networks from its alleged markets is not plausible. The Government alleges that Interbank Payment Networks perform the same function as other debit networks: facilitating direct consumer-to-merchant transactions funded from the consumer's bank account. Yet, the Government also alleges that Interbank Payment Networks do not compete with other forms of debit because they allegedly lack several features that the Government has poorly defined, or not defined at all.

This is fatal to the Government's market definition, and its case, for at least two reasons. First, as a matter of law, a product cannot be excluded from a market solely because it allegedly lacks certain features. Second, the Government's market allegations are implausible because they are filled with internal contradictions.

### A.    The Government Cannot Exclude a Product for Lacking Certain Features

"At the motion-to-dismiss stage, a plaintiff's proposed relevant market must bear a rational relation to the methodology courts prescribe to define a market and include a plausible explanation as to why a market should be limited to exclude possible substitutes." *Regeneron*, 96 F.4th at 338 (cleaned up). To exclude a product from the market, the plaintiff must plead facts plausibly showing the product is not "reasonably interchangeable" with in-market products. *Id.* at 339.

Importantly, when courts evaluate relevant markets, they "presume[] that consumers are willing to make tradeoffs" on features in exchange for price differences. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *see also Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001) ("Reasonable interchangeability fully acknowledges differences in product characteristics, reflecting commercial realities."). Accordingly, even at the motion-to-dismiss phase, a recitation of different features is not "a plausible explanation as to why a market should be limited to exclude [a] possible substitute[]." *Regeneron*, 96 F.4th at 338; *see also Mathias*, 152 F. Supp. 2d at 482.

The Government ignores this law. It excludes Interbank Payment Networks because they allegedly have slower processing times and lack fraud detection, chargeback services, and dispute resolution. Compl. ¶ 159. The Government does not, however, explain why those features are market-defining. At most, it alleges that Interbank Payment Networks are "inconvenient" for some merchants and consumers because of these differing features. *Id.* But the same could be said about any number of features that make a consumer prefer one product over another.

Courts have repeatedly granted motions to dismiss in similar circumstances.

The Eleventh Circuit rejected a market where plaintiffs attempted to exclude a product based on "unique attributes," but failed to explain whether consumer preferences would "vary at all." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010).

The Ninth Circuit similarly rejected a market because alleging that products "have their differences" is not enough to plausibly allege that those two products are not "reasonably interchangeable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1116, 1121 (9th Cir. 2018).

District courts have reached the same result. *See, e.g.*, *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) ("unique attributes and components"

that make a product "more attractive and efficient" do not distinguish it from other products that "permit users to accomplish the same basic task"). In this district, Judge Marrero explained that "distinctions" in products are "virtually meaningless" without an explanation of why the two products are not "functional substitute[s]." *Mathias*, 152 F. Supp. 2d at 482. And then-Judge Sotomayor dismissed antitrust claims because a plaintiff sought to exclude products based on additional features that did nothing more than "enhance the enjoyment of the product." *Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997).

The Government addresses its exclusion of Interbank Payment Networks from its proposed market in a single paragraph containing an allegation that these networks lack a few features possessed by some other debit offerings. Compl. ¶ 159. That is never enough. But here the Government's minimal allegations also reveal the weakness of its case. After years of investigating Visa's debit business, if the Government could have alleged more, it would have.

### B.    The Government's Market Allegations Are Self-Contradictory

In reviewing a motion to dismiss, a district court "is not required to credit conclusory allegations unsupported by facts or to suspend common sense in conducting its analysis." *AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *3 (S.D.N.Y. 2019) (cleaned up). Allegations that are "conflicting," "incoherent," or "contradicted by other matters asserted" are not plausible. *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005); *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001). As Judge Failla succinctly put it, courts must review the complaint "shorn of internal contradictions." *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 574 (S.D.N.Y. 2017).

The Government's allegations are implausible because they are irreconcilable.

First, Interbank Payment Networks indisputably provide the functionality that the Government alleges defines the debit market, making the exclusion of these networks incoherent. Interbank Payment Networks "facilitate the debit (*i.e.*, withdrawal) of funds directly out of a consumer's bank account." Compl. ¶ 152; *see also id.* ¶ 61. This functionality is crucial, says the Government, because it drives consumer preferences and distinguishes debit from other payment methods like credit. *Id.* ¶ 27; *see also id.* ¶ 157 (excluding credit cards because they rely on a "line of credit"). Consumers choose debit, among other reasons, because they want to enforce spending discipline, have "limited credit" options, or like "the convenience of debit over cash and checks." *Id.* ¶ 27. Each of these preferences derives from debit's unique ability to transfer funds directly from a consumer's bank account—an ability shared equally by Interbank Payment Networks.

Second, the Government's reliance on Interbank Payment Networks lacking a few undefined features to exclude these networks is inconsistent with its treatment of in-market networks. *See supra* Part II.A. The debit networks included in the Government's alleged market vary greatly: They operate on different "rails," use different mechanisms for fraud protection, offer different fraud-protection levels, and either require issuance of a physical debit card or operate in a digital wallet. *Id.*

The Government's allegations further establish that these differences between in-market networks are consequential to its allegations of misconduct. *See supra* Part II.A.2. The Government, for example, includes the PIN Networks in its alleged market even though, by the Government's own allegations, they are unable to compete for approximately *half* of debit transactions due partly to insufficient fraud protection. Compl. ¶¶ 58, 73, 80. The Government describes these debit transactions as "non-contestable" and somehow blames Visa for the PIN Networks' shortcomings.

Yet the Government makes no attempt to address whether Interbank Payment Networks are similarly disadvantaged because of the features they allegedly lack. Compl. ¶ 159. This disparate treatment of PIN Networks and Interbank Payment Networks is incoherent.

Third, the Government's conclusory allegation that Interbank Payment Networks lack "dispute resolution," "chargeback services," and "fraud detection" is similarly insufficient. The Government: (1) provides no details about the alleged "dispute resolution" and "chargeback services" offered by alleged in-market debit networks; (2) does not allege that in-market debit networks provide "dispute resolution" and "chargeback services" uniformly; and (3) admits that PIN Networks also lack "acceptably robust fraud detection." Compl. ¶ 105. The Government must be consistent. It cannot allege that these features are a plausible basis for excluding Interbank Payment Networks when it concedes that in-market networks lack the same or similar features.

Fourth, the Government's treatment of Fintech Debit Networks and Interbank Payment Networks is nonsensical. The Government alleges that Visa "fears" Fintech Debit Networks, largely because of their ability to pay merchants directly from a consumer's bank account. Compl. ¶¶ 62, 108, 113. But Fintech Debit Networks are only able to do so because they utilize Interbank Payment Networks (like ACH and RTP). *Id.* ¶¶ 61, 156. The Government cannot logically maintain both that: (1) Fintech Debit Networks, which rely on Interbank Payment Networks, are a competitive threat; and (2) Interbank Payment Networks are not in the market because they are not a viable alternative to other debit offerings. *Cf. GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739, at *20 (S.D.N.Y. 2023) (rejecting attempt to broaden and narrow market for different purposes).

Fifth, the Government's allegation that Interbank Payment Networks are outside the market because ACH has longer processing times is contradicted by its other allegations. The Government

16

admits that certain Interbank Payment Networks—such as RTP and FedNow—are instantaneous. Compl. ¶ 159. Moreover, the Government includes Fintech Debit Networks in the market, even those these networks admittedly use ACH (with its longer processing times) to execute consumer-to-merchant transfers. *Id.* ¶ 61. This defies common sense.

Sixth, the Government tacitly admits that Interbank Payment Networks compete with other debit networks. The Government describes Interbank Payment Networks as "lower-cost alternative to Visa's debit offerings" and asks this Court to enjoin Visa from "imposing contractual limitations" on the use of "ACH" and "RTP." Compl. ¶¶ 61, 203(g)(ii). If these payment methods did not compete with Visa, the Government would not need to seek relief prohibiting Visa from discouraging their use.

In the end, litigation strategy, not economic reality, drives the Government's treatment of Interbank Payment Networks. The Government must include Fintech Debit Networks that use Interbank Payment Networks in its alleged market because the Government alleges that Visa has sought to thwart this competitive threat. Compl. ¶¶ 193–97. But it excludes Interbank Payment Networks themselves. Whatever the motivation, the Government should not be permitted to proceed with a market definition that excludes products it concedes are a significant competitive threat to Visa's debit offerings.

## II.    THE GOVERNMENT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT

The Complaint must also be dismissed because it fails to allege anticompetitive conduct, an essential requirement of Section 1 and Section 2 claims. First, the Government seeks to impose liability on Visa for offering volume-based discounts. But courts have explained that such discounts are anticompetitive only when the discount sets the product's price below the defendant's costs—which is not alleged here. Second, the Government attacks Visa's agreements

with technology partners as "agreements not to compete." But the express language of the agreements explicitly allows for competition, and the Government presents no other evidence of an unlawful agreement.

### A.   The Government's Volume-Discount Claims Fail as a Matter of Law Because It Has Not Alleged Below-Cost Pricing

The Government's claims based on Visa's price discounts should be analyzed under the price-cost or discount-attribution tests, rather than the full-blown rule-of-reason analysis used to evaluate alleged exclusive deals. The price-cost and discount-attribution tests require the Government to allege that Visa has set prices below its costs, full stop. Because the Government has not done so, its claims must be dismissed.

The price-cost and discount-attribution tests are the safe-harbor tests traditionally applied to price discounts. Under the price-cost test, single-product discounts are only considered potentially anticompetitive if the defendant has engaged in "predatory" below-cost pricing. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). Under the discount-attribution test, which is a variant of the price-cost test, multi-product bundled discounts are only considered potentially anticompetitive if the price of the competitive product is below the defendant's costs after the "entire discount on all products" is applied to that product. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 907 (9th Cir. 2008) (internal quotation marks omitted).

The Court should apply these tests here. The Supreme Court requires application of the price-cost test to single-product discounts, and the Ninth Circuit, Sixth Circuit, and antitrust experts have endorsed applying the discount-attribution test to multi-product discounts. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 231 (1993) (applying price-cost test to "volume rebates"); *PeaceHealth*, 515 F.3d at 903, 907 (applying discount attribution test to multi-product discounts); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d

264, 272 (6th Cir. 2015) (same); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶749d3 (5th ed. 2024). The Supreme Court has repeatedly instructed courts that, to "avoid chilling aggressive price competition," they should adopt well-defined rules to analyze price discounts rather than simply applying the rule of reason. *linkLine*, 555 U.S. at 451; *see, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007); *Brooke Grp.*, 509 U.S at 224–27. The price-cost test and discount-attribution tests are those "well-defined rules."

To avoid the required cost-based tests, the Government seeks to relabel Visa's alleged conduct as "de facto" exclusive dealing subject to the rule of reason. Compl. ¶¶ 69, 79, 98. According to the Government, some debit transactions are "non-contestable" because they can only be processed by a Front-of-Card Network, like Visa or Mastercard, while the rest are "contestable." *Id.* ¶¶ 58, 79. The Government alleges that Visa's pricing scheme is anticompetitive because it bundles these "contestable" and "non-contestable" transactions into a single discount package, financially incentivizing merchants to route many "contestable" transactions through Visa. Ex. 6, Conference Tr., 11/12/2024, 8:23–9:16.

This relabeling cannot save the Government's claims. At most, describing Visa's price cuts as bundled discounts means that they should be analyzed under the discount-attribution test rather than the price-cost test.[2] But either test requires dismissal of the Government's claims.

---

[2] The Government's claim is not a traditional multi-product bundling claim. The Government alleges that Visa bundles different types of *demand* for a single product. Many courts have rejected the viability of single-product bundling claims. *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000).

Courts do not allow plaintiffs to avoid the well-defined threshold rules used to analyze price discounts based on the assertion that the discount creates "de facto" exclusivity. The Third Circuit, for example, has held that the price-cost test should be applied to "de facto" exclusive deals whenever "price is clearly the predominant method of exclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012); *see also Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *10 (S.D.N.Y. 2019) ("[T]he price-cost test applies even when pricing is not the 'predominant method of exclusion.'"). The leading antitrust treatise agrees: unless price is set below cost, "[d]iscounts attached merely to the quantity of goods purchased, and not to exclusivity itself, [should] be treated as lawful, and not be subjected to the laws of exclusive dealing." Areeda & Hovenkamp, *supra*, at ¶1807b3.

Under either the price-cost test or discount-attribution test, the Government's claims fail because the Complaint is silent on Visa's costs relative to its discounted prices. The Government's allegations, many just hypotheticals, focus on whether PIN Networks can match Visa's volume discounts. Compl. ¶¶ 80–83. But that is not the operative question. These tests look at the defendant's costs, not a particular competitor's costs, because the tests are concerned with competition as a whole and not the ability of a specific set of rivals to compete. *PeaceHealth*, 515 F.3d at 905–06.

In short, the Government's claims fail on their face because the Government has not alleged Visa has set prices below its costs in any manner.

### B.    The Government's "Agreement-Not-To-Compete" Claims Fail Because They Ignore the Explicit Language of the Agreements

The Government's claims based on Visa's alleged non-compete agreements with Apple, PayPal, and Square also fail. According to the Government, "Visa's agreements pay" these technology companies "not to compete." Compl. ¶ 196. But a review of the agreements

themselves, which are the only things the Government relies upon to allege the existence of such an agreement, shows nothing of the sort.[3]

As courts have explained, allegations about written agreements should be disregarded when they "[are] contrary to the [agreements'] text." *New York v. Meta Platforms*, *Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023). In *In re Google Digital Advertising Antitrust Litigation*, for example, plaintiffs alleged that an agreement between Google and Facebook limited competitive bidding for advertising. 627 F. Supp. 3d 346, 373 (S.D.N.Y. 2022). The court dismissed that claim because the "the express terms" of the relevant "provision do not on [their] face . . . constrain Google's actions" and "cannot be reasonably read to require collusive bidding." *Id.* at 376. In *Dream Big Media v. Alphabet Inc.*, the court similarly dismissed a "tying" claim after finding that the agreement's language could not "reasonably be understood to" include the restraint alleged. 2024 WL 3416509, at *4 (N.D. Cal. 2024).

The Court should do the same here.

### 1.      Apple Agreements

Visa's two independent agreements with Apple—the Technology Agreement and Merchant Agreement—do not prohibit Apple from competing with Visa.

The Government alleges that Visa has paid Apple "millions of dollars" in incentives not to "disintermediate" Visa by introducing an alternative debit network within Apple Pay. Compl. ¶ 136. This is false.

---

[3] These agreements are either incorporated by reference or integral to the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The Apple Technology Agreement involves ███████████████████████████
███████ Instead, it provides Apple a license to Visa's intellectual property rights and technology ██
████████████████████████████████████████████████████████████████

███████ The Apple Technology Agreement does not prevent Apple from developing a competing
payment network but simply allows Visa to walk away if Apple does. The agreement provides:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

██████████

An addendum to the Apple Technology Agreement, in fact, contemplates that Apple may
███████████████████████████████████████████████████████████
████████████████████████████████████████████ If Apple does
so, Apple must simply ████████████████████████████████████████
The amendment also explicitly states that ███████████████████████████████████
████████████████████████████████████████████████████████████

These provisions are consistent with the antitrust laws. They simply embody the "general
rule" that businesses "are free to choose the parties with whom they will deal, as well as the prices,
terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. It is black-letter law that Visa has
no duty to deal with Apple, let alone give Apple access to its proprietary technology and services.
*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004).

Visa has a separate agreement with Apple involving financial incentives—the Apple
Merchant Agreement. Like many of Visa's other merchant routing agreements, the Merchant
Agreement rewards Apple ████████████████████████████████████████

███████████████████████████████████████████████████████

There is nothing anticompetitive about this agreement either.

As an initial matter, Visa pays these financial incentives to Apple *as a merchant*. Under the terms of the Merchant Agreement, Visa's right to withhold incentives (or terminate) is ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ Because ████████████████████████████ under the terms of the agreement, Apple would continue to receive the same financial incentives even if Apple introduced a "Fintech Debit Network" in Apple Pay ████████████████████

██████████████████████

In any event, antitrust law does not require Visa to continue to provide financial incentives to Apple. Again, businesses "are free to choose the parties with whom they will deal, as well as the *prices*, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448 (emphasis added). If Apple decides to introduce competing payment methods or make it difficult for cardholders to use Visa cards—at Apple locations—Visa (like other businesses) is entitled to change the prices it charges Apple.

### 2.    PayPal Agreement

The Government's allegations regarding PayPal fail for similar reasons. The Complaint alleges that Visa tried to "squash PayPal's use of ACH." Compl. ¶ 122. But even the Government admits that PayPal customers continue to use ACH.[4] *Id.* ¶ 123.

This is not surprising, because the PayPal Agreement does not prohibit PayPal's use of ACH. It ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ There is nothing anticompetitive, or unusual, about Visa negotiating with PayPal to ███████████████

███████████████████████████████████████

The Government's allegation that Visa "restricts PayPal's in-store ACH funding transactions to a QR code model," Compl. ¶ 123, is false. The Agreement just ████████████

███████████████████████████████████████████████████████████████

██████ But it expressly states ████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[4] This allegation further highlights the implausibility of the alleged market: the Government simultaneously (1) claims Visa attempted to "squash Paypal's use of ACH" because it is a competitive threat and (2) excludes ACH and all other Interbank Payment Networks from its alleged market. Compl. ¶ 122.

.[5] And if ██████████████████████████████████████████████████████████████████████████████████████████████

### 3.    Square Agreement

The Government's allegations regarding Square are insufficient on their face. The Government alleges that the terms of Visa's agreement with Square require it to route over 90% of its Cash App Pay transactions over Visa's rails. Compl. ¶ 132. But the Government never alleges Square agreed not to compete; instead, Square allegedly agreed not to "*steer customers to ACH* in Cash App Pay." *Id.* (emphasis added). Requiring an equal playing field is not equivalent to prohibiting Square from competing with Visa and is not an antitrust violation.

\*\*\*

The express terms of the relevant agreements demonstrate that the Government's allegations are inaccurate and insufficient, requiring dismissal of these claims.

### <u>CONCLUSION</u>

The Government's Complaint should be dismissed.

---

[5] The Government does not allege that "Visa Rules," which provide compliance and security policies, prohibit ACH.

DATED: December 16, 2024                    Respectfully submitted,


                                            /s/ *Beth A. Wilkinson*
                                            Beth Wilkinson (SBN NY 2181592)
                                            Brian Stekloff (admitted *pro hac vice*)
                                            Kieran Gostin (SBN NY 4847653)
                                            Roxana Guidero (admitted *pro hac vice*)
                                            **WILKINSON STEKLOFF LLP**
                                            2001 M Street NW, 10th Floor
                                            Washington, DC 20036
                                            Telephone: (202) 847-4000
                                            Facsimile: (202) 847-4005
                                            bwilkinson@wilkinsonstekloff.com
                                            bstekloff@wilkinsonstekloff.com
                                            kgostin@wilkinsonstekloff.com
                                            rguidero@wilkinsonstekloff.com


                                            Anne P. Davis (*admitted pro hac vice*)
                                            Jonathan Ian Gleklen (*admitted pro hac vice*)
                                            **ARNOLD & PORTER KAYE SCHOLER
                                            LLP**
                                            601 Massachusetts Avenue NW
                                            Washington, D.C. 20001
                                            Telephone: (202) 942-6197
                                            Facsimile: (202) 942-5999
                                            anne.davis@arnoldporter.com
                                            jonathan.gleklen@arnoldporter.com


                                            *Counsel for Defendant Visa Inc.*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify under Section II.D of Judge Koeltl's individual practices that this memorandum contains 6,986 words, exclusive of the cover page, table of contents, table of authorities, and this certification. I further certify that this memorandum complies with the formatting rules provided in Section II.D of Judge Koeltl's individual practices.

By: <u>/s/ *Beth A. Wilkinson*</u>
Beth A. Wilkinson