**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Case No. 1:24-cv-07214-JGK-SLC |
| v. | |
| VISA INC., | |
| *Defendant.* | |
| | Oral Argument Requested |

<u>**THE UNITED STATES' OPPOSITION TO VISA INC.'S MOTION TO DISMISS**</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL BACKGROUND .......................................................................... 2

    A.     Consumers, Merchants, and Banks Rely on Debit Network Services to Process Debit
Transactions ....................................................................................................... 2

    B.     Visa Has a Monopoly in Debit Transaction Services ........................................ 3

    C.     Visa Protects its Debit Monopoly Through an Anticompetitive Course of Conduct ......... 4

       1.     Visa's Conduct Toward Merchants Compels Exclusivity, Which Forecloses
Competition ..................................................................................................... 5

       2.     Visa Uses a Variety of Tactics with Issuers to Stifle Competition ................. 6

       3.     Visa "Partner[s] with Emerging Players Before They Become Disruptors" ................. 7

III.   LEGAL STANDARDS .................................................................................... 7

IV.    ARGUMENT .................................................................................................... 8

    A.     The United States Has Alleged Relevant Product Markets ............................... 8

       1.     Visa's Other Cases Are Inapposite ............................................................... 12

       2.     The Alleged Markets are Consistent ............................................................. 12

    B.     The Complaint Adequately Alleges That Visa Has Engaged in Anticompetitive
Conduct ............................................................................................................ 13

       1.     The United States Properly Pleaded that Visa's Routing Agreements Violate
Sections 1 and 2 of the Sherman Act ........................................................... 14

       2.     Visa Stifles Innovation and Competition Through Unlawful Agreements Not to
Compete .......................................................................................................... 19

V.     CONCLUSION .............................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022).........................15

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........................18

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .............................................8, 9

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)......................................22

*City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981) ......................14

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264 (6th Cir. 2015)...............................19

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962).........................14

*Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25 (S.D.N.Y. 2016)...................................15

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024) ............20

*Eastman Kodak Co. v. Image Tech. Svcs.*, 504 U.S. 451 (1992)....................................9

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)....................................................19

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020).......................................15

*FTC v. Syngenta Crop Protection AG*, 711 F. Supp. 3d 545 (M.D.N.C. 2024) .........15, 16, 17, 19

*FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024)...........................11

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)...........................11

*Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ..........................................................12

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018).......................................12

*Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327 (11th Cir. 2010)...............................12

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...........................12

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ..............................................................12

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
323 F. Supp. 2d 559 (S.D.N.Y. 2004) (Koeltl, J.) ............................................7

*Nat'l Soc'y of Prof'l Engrs. v. United States*, 435 U.S. 679 (1978) ............................................ 20

*NCAA v. Alston*, 594 U.S. 69 (2021) .......................................................................................... 8

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ............................ 8

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ............................................... 20

*Oakley v. Dolan*, 980 F.3d 283 (2d Cir. 2020) ................................................................. 7, 8, 17

*Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ......................................... 20

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ....................................................................... 19

*Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024) ...................................................................................... 19

*PharmacyChecker.com, LLC v. Natl Ass'n of Bds. of Pharm.*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021) ....................................................................................... 21

*Pulse Network, LLC v. Visa Inc.*, 30 F.4th 480 (5th Cir. 2022) ........................................... 18, 19

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024) ............... 9, 11, 12

*Remicade Antitrust Litig.*, 345 F. Supp. 3d 566 (E.D. Pa. 2018) ......................................... 15, 17

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ..................................................................................... 7

*Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086 (C.D. Cal. 2007) ......... 12

*Surescripts Antitrust Litig*, 608 F. Supp. 3d 629 (N.D. Ill. 2022) ...................................... 15, 18

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ..................................................... 14

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) ............................................. 9

*United States v. Google LLC*, 2024 WL 3647498 (D.D.C. 2024) ................................... 19, 20, 22

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .................................................. 8

*Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093 (S.D.N.Y. 2019) ............................. 18

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ................... 18

*ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ........................................ 14, 15, 16

**Statutes**

15 U.S.C. § 1 ..................................................................................................................... 7

15 U.S.C. § 2 ..................................................................................................................... 8

## I.    <u>INTRODUCTION</u>

Visa has been the dominant provider of general purpose debit network services in the United States for decades. Today more than 60% of $4 trillion in U.S. debit transactions run on Visa's debit network. Compl. at 4. Visa's power in U.S. debit markets allows it to use a web of restrictive agreements with customers and other industry participants to extract large profits and insulate itself from competition. *Id.* ¶¶ 166–167. This conduct harms consumers and merchants, who miss out on innovation and increased choice and price competition. *Id.* ¶ 139.

Rather than accepting the Complaint's allegations as true, Visa's motion to dismiss addresses strawmen that bear little resemblance to the facts alleged. Visa disputes the Complaint's market definition allegations, isolates one example of anticompetitive conduct while ignoring all others, and applies the wrong legal standards to the Complaint's allegations. The United States has sufficiently alleged that Visa is a monopolist that has engaged in an unlawful course of conduct to reduce competition, stifle innovation, and harm consumers and merchants. The Court should reject Visa's arguments to the contrary.

<u>First</u>, Visa argues that the general purpose debit network services markets alleged in the Complaint are implausible because they exclude ACH, RTP, and FedNow (which Visa labels as "Interbank Payment Networks") that sometimes function similarly to debit networks. Br. at 1–2, 12–17. Yet, the Complaint distinguishes ACH, RTP, and FedNow as having "slower processing times" and "lack[ing] fraud detection, chargeback services, and dispute resolution" that customers demand from debit services. *Id.* at 13 (quoting Compl. ¶ 159). Even if the products have some functional similarity, the test is whether they are reasonably interchangeable under economic principles. They are not, as shown by, *inter alia*, Visa's alleged ability to charge high fees without losing business to ACH, RTP, and FedNow.

Second, Visa focuses on its routing agreements with merchants, ignoring other allegations about Visa's monopoly maintenance.  Moreover, Visa's assertions regarding the exclusionary nature of the routing agreements are wrong: the Complaint alleges facts showing they are de facto exclusive arrangements that shut out rivals by punishing merchants for using rival networks.  Visa's routing agreements are anticompetitive, not because Visa offers low prices to win merchants' business, but rather because Visa demands exclusivity or near-exclusivity for merchants to avoid punitive rack rates and fees.

Third, Visa attempts to rewrite the Complaint with respect to a narrow category of contracts involving Apple, PayPal, and Square to force application of a doctrine—unilateral refusal to deal with rivals—that does not apply.  The Complaint alleges a course of anticompetitive conduct far broader than the agreements Visa discusses.  And even the small subset of contracts Visa relies on supports the United States' claims.  These agreements are part of a voluntary course of dealing to prevent potential rivals from competing, not a refusal by Visa to help its existing rivals.

For these reasons and those set forth below, the United States respectfully requests that the Court deny the motion to dismiss.

## II.    FACTUAL BACKGROUND

### A.  Consumers, Merchants, and Banks Rely on Debit Network Services to Process Debit Transactions

In a general purpose debit network services ("debit") transaction, funds are drawn directly from a consumer's bank account to pay a merchant for goods or services.  Compl. ¶ 24.  These transactions require a payment network (or "rail") that uses a customer's payment credential to communicate between the customer, the customer's bank, the merchant, and the merchant's bank.  *Id.* ¶¶ 29, 31, 153.  Companies like Visa provide those network services and,

in so doing, not only facilitate the transfer of funds between accounts but also provide related services that customers demand of a debit transaction.  These services include guaranteeing payment to merchants when the transaction is made, allowing consumers to dispute a transaction, and offering fraud protections.  *Id.*

Merchants, consumers, and banks consider debit a distinct form of payment that is not interchangeable with credit cards, cash, and other methods.  *Id.* ¶¶ 155–160.  Many consumers cannot access credit or consider debit more convenient than cash or credit.  *Id.* ¶¶ 157, 160.  ACH does not process transactions immediately or offer the minimum services that debit network services provide, such as fraud protections and dispute resolution, that merchants and customers require.  *Id.* ¶ 159.  Other bank-transfer networks like RTP are only "available to banks."  *Id.* ¶ 61.  Because of these differences, bank-transfer networks, credit cards, cash, and other payment products are not a reasonable alternative to debit network services.

**B.  Visa Has a Monopoly in Debit Transaction Services**

Visa handles over 60% of all U.S. debit transactions and 65% of card-not-present debit transactions (*e.g.*, online transactions), which make up half of all debit sales.  *Id.* ¶¶ 6, 37.  Visa has used this dominant position to charge supracompetitive prices for decades.  *Id.* ¶ 66.  Visa sets its prices without regard to its incremental costs, and it has raised prices without losing market share.  *Id.* ¶¶ 174–175.  Because so many consumers use Visa-branded debit cards, it is a commercial necessity for merchants to accept Visa.  *Id.* ¶ 59.

Recognizing the need for greater debit competition, Congress passed the Durbin Amendment, which requires that each debit card support at least two unaffiliated debit networks—one on the front of the card and at least one on the back of the card.  *Id*. ¶ 8.  This was intended to give merchants and their banks at least two choices for routing a particular transaction.  *Id.*

3

### C. **Visa Protects its Debit Monopoly Through an Anticompetitive Course of Conduct**

For at least two reasons, Visa's monopoly power gives it the ability to exclude or suppress alternative debit networks.  First, success in debit network services markets depends on "network effects," a feedback loop in which small networks face the "herculean task" of simultaneously gaining widespread acceptance by merchants and widespread enablement by issuers (*i.e.*, the banks that issue debit cards to consumers).  *Id.* ¶ 55.

Second, despite the Durbin Amendment's mandate for routing alternatives, Visa still faces no competition for a substantial number of transactions.  *Id*. ¶¶ 58, 79.  These debit transactions that Visa processes outright without facing any competition are "non-contestable" transactions (*i.e.*, meaning they cannot be routed to "back-of-card" networks).  *Id.* ¶ 10.  Other debit networks can compete for a transaction only if both the merchant's bank (the "acquirer") and the consumer's bank (the "issuer") have enabled the network.  Transactions are "non-contestable" for various reasons, including issuer-imposed restrictions encouraged by Visa; the option to enter a PIN for card-present transactions is not available; or the transaction exceeds the PIN network transactions dollar limits.  *Id*. ¶¶ 57–58.

As the Complaint alleges, network effects, combined with Visa's large base of non-contestable transactions, allow Visa to engage in a broad course of anticompetitive conduct to prevent existing and potential competitors from challenging Visa.  This conduct falls into three general categories: conduct with merchants (and their banks), conduct with issuing banks, and conduct with fintech companies.

### 1. Visa's Conduct Toward Merchants Compels Exclusivity, Which Forecloses Competition

Visa uses a variety of agreements that penalize merchants and increase their fees if they shift even a small volume of transactions to an alternative network. These agreements, along with other tactics, compel exclusivity from merchants.

**Routing agreements**. Contestable transactions, unlike non-contestable, are ones that merchants should be able to route to rival networks. Visa's routing agreements, however, require merchants and their acquirers to use Visa, not the back-of-card networks, for a high percentage (often 100%) of all transactions. *Id.* ¶¶ 75, 79. Visa has this power because, in the absence of a routing agreement, Visa threatens to impose high fees—its "rack rates"—on merchants and acquirers, including for non-contestable transactions. *Id.* ¶¶ 75, 77–79. Even when merchants and acquirers accede to Visa's routing agreements, Visa threatens them with rack rates and other fees as a penalty if they fail to route all or almost all their transactions to Visa. *Id.* This has the effect of forcing merchants into exclusive dealing relationships with Visa for the vast majority of their volume of Visa-branded debit card transactions. *Id.* ¶ 81.

Because of the threat of Visa's punitive rack rates on contestable and non-contestable transactions alike, it is not economical for merchants or acquirers to route transactions away from Visa, even when the back-of-card networks offer a lower per-transaction price than Visa for contestable transactions. *Id.* ¶¶ 77–79. Under Visa's routing agreements, many merchants also face significant additional fees for not meeting volume requirements, such as termination fees and the claw back of "discounts" below rack rates. *Id.* These high rack rates and other penalties are so steep that merchants who want to use a rival network typically could not offset the cost of doing so even if a back-of-card network offers a lower per-transaction price for contestable transactions. *See id.* ¶¶ 80–81 (explaining mathematically how back-of-card networks are often

unable to compete with Visa). This creates a Hobson's choice for merchants—deal exclusively with Visa or face penalties. Due to the "incentives" Visa imposes, its routing agreements are de facto exclusive for Visa-branded debit card transactions. *Id.* Roughly 45% of all debit transactions in the U.S. and 75% of transactions with Visa-branded cards are foreclosed from competition altogether because of Visa's routing agreements. *Id.* ¶ 141.

**New Fees**. Visa has a history of introducing new fees it can "waive" in exchange for exclusivity or near exclusivity. *Id.* ¶ 87. These fees, including the Fixed Acquirer Network Fee and Digital Commerce Service Fee, are additional pressure points Visa can use to compel agreements more favorable to Visa with merchants and their banks and make it even more difficult for merchants to route transactions to competing debit networks. *Id.* ¶¶ 87, 175.

**Other Conduct**. Visa also uses other tactics to protect its debit monopoly. For example, Visa sometimes prices credit products based on how much debit volume merchants route to Visa, and Visa has used its credit business to discourage functionality called "PINless" enablement that would make rival debit networks more attractive. *Id.* ¶ 85.

### 2. Visa Uses a Variety of Tactics with Issuers to Stifle Competition

Unaddressed by Visa's motion is the allegation that, even though debit cards can support multiple back-of-card networks, Visa induces issuers to limit the enablement of rival networks. Visa has done this with explicit contractual language, *id.* ¶ 88, volume incentives, *id.* ¶¶ 89-93, and by offering discounts on other products, such as debit processing services, to lock up more volume, *id.* ¶ 94. This conduct suppresses smaller networks' ability to compete by starving them of transactions and the scale they need to become more robust competitors to Visa. *Id.* ¶¶ 20, 142.

### 3. Visa "Partner[s] with Emerging Players Before They Become Disruptors"

Innovation from technology giants, including Apple, PayPal, and Square, could give consumers new ways to pay for goods and services using their bank accounts. *Id.* ¶¶ 108–109. Because Visa fears that these potential competitors could displace Visa as an intermediary between both sides of a debit transaction, Visa uses its monopoly power to stifle them. *Id.* ¶¶ 111–118. With some potential competitors, Visa uses a carrot-or-stick strategy like the one it uses with merchants, acquirers, and issuers. It "seek[s] to partner with" them "to mitigate threats," rather than compete on the merits through lower prices or better products, by dangling big payoffs in exchange for commitments not to compete with or disintermediate Visa. *Id.* ¶¶ 111, 119. And it threatens them with high fees if they dare to compete with Visa. *Id.* ¶¶ 16, 119, 125. Visa has employed this strategy for years with at least PayPal, Apple, and Square.

### III.   LEGAL STANDARDS

To overcome a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim for relief that is plausible on its face," and the Court is to "accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Oakley v. Dolan*, 980 F.3d 279, 283 (2d Cir. 2020) (cleaned up). The Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc*., 323 F. Supp. 2d 559, 561 (S.D.N.Y. 2004) (citation omitted) (Koeltl, J.).

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts and agreements that unreasonably restrain trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Agreements are either condemned as unreasonable per se, *id.*, or otherwise assessed under a "rule of reason" analysis, which "generally requires a court to conduct a fact-specific assessment of market power and

market structure to assess a challenged restraint's actual effect on competition." *NCAA v. Alston*, 594 U.S. 69, 81 (2021) (cleaned up).

Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, which requires: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, sometimes termed anticompetitive conduct. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015); *accord United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001).

## IV.    ARGUMENT

Visa's motion fails because the Complaint alleges straightforward violations of Sherman Act Sections 1 and 2.  The Complaint adequately pleads (1) Visa's market and monopoly power in two relevant product markets in the United States: general purpose debit network services and a narrower, card-not-present submarket (together, the "debit network services" markets), Compl. ¶¶ 151–175, and (2) how Visa's exclusionary agreements and other anticompetitive conduct have harmed competition and maintained its monopoly in the debit network services markets by stifling competitive threats and squashing innovative alternatives, *id.* ¶¶ 63-137.  Visa attacks the Complaint on both fronts: the alleged relevant product markets and the anticompetitive nature of two (but not all) types of alleged conduct.  The Court should reject these challenges because they ignore, distort, and disagree with numerous allegations in the Complaint, rather than "accept [them] as true." *Oakley*, 980 F.3d at 283.

### A.  The United States Has Alleged Relevant Product Markets

A "relevant product market" refers to the products that customers would likely turn to as substitutes if one of the firms making those products increased price or decreased quality. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  To determine the outer boundaries of a product market, courts analyze whether consumers treat the products as

reasonably interchangeable substitutes (*i.e.*, "economic substitutes"), not whether the products "appear to be functionally similar." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339–41 (2d Cir. 2024); *see also Eastman Kodak Co. v. Image Tech. Svcs.*, 504 U.S. 451, 482 (1992) (market definition "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers"). For example, in *Regeneron*, the court upheld a relevant market for a medication delivered in "prefilled syringes," to the exclusion of the same medication treating the same condition delivered in vials, based on allegations "that physicians have a 'strong preference' for" syringes and other facts showing a lack of significant substitution between syringes and vials. 96 F.4th at 339–41.

Courts also look to "practical indicia" to identify whether two products are economic substitutes. *Brown Shoe*, 370 U.S. at 325. These indicia can include "industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id*. Because "market definition is a deeply fact-intensive inquiry," courts "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Regeneron*, 96 F.4th at 339 (citation omitted); *accord Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.).

The product markets alleged in the Complaint easily meet this "relatively permissive pleading standard." *Regeneron*, 96 F.4th at 339. The Complaint describes three factors that establish why the alleged product markets plausibly satisfy the requirements of a Sherman Act claim: (1) minimum attributes that distinguish general purpose debit network services from other payment methods; (2) why a non-debit payment network's mere ability to directly transfer funds is insufficient to make it a reasonable substitute for debit network services; and (3) Visa's

persistently high debit shares and ability to price debit network services without regard to cost or losing sales to non-debit payment methods. Visa's arguments either do not account for or misconstrue these allegations.

First, each of the debit networks in the relevant product markets includes the "minimum attributes of debit" that "distinguish debit from other methods of payment." Compl. ¶ 153. Debit network services require, at a minimum, (1) a communication "rail" that facilitates real-time transactions paid directly from a consumer's bank account, (2) the ability for the consumer or her bank to dispute and chargeback the transaction; (3) payment guarantees for merchants; and (4) fraud protections for all parties. Compl. ¶¶ 29, 152–153.

Second, Visa argues that ACH, FedNow, and RTP must be included in the relevant markets as a matter of law because they have one of the four minimum attributes of debit—facilitating direct consumer-to-merchant transactions funded from the consumer's bank account. Br. at 12. In addition to raising a factual question about functionality, this argument ignores the Complaint's allegations that each of these products lacks one or more key attributes of debit network services and is thus not reasonably interchangeable with debit. For example, ACH transfers are not done in real time, and FedNow and RTP lack "fraud detection, dispute resolution, and chargeback services." Compl. ¶ 159. Also, RTP is only "available to banks," *id.* ¶ 61, making it an unrealistic option for consumers. For these reasons, ACH, RTP, and FedNow have a more limited use case than debit networks: "disbursements, paychecks, interbank settlements, and recurring fixed payments like mortgage and tuition payments." *See id.* ¶ 159.

In addition, the Complaint alleges facts showing that these differing attributes mean that consumers, issuers, merchants, and acquirers will not substitute debit network services with ACH, FedNow, or RTP in the face of a debit price increase; they do not view the other payment

services as suitable substitutes for debit, *see, e.g.*, Compl. ¶¶ 155, 157–160.  As a result, a hypothetical debit monopolist "would be able to maintain prices above the level that would prevail in a competitive market."  *Id*. at ¶ 150.

Third, the Complaint is replete with examples of Visa's exercise of its monopoly power, *see generally id.* at ¶¶ 138–146, 164–175, that further support the plausibility of the United States' markets.  The Complaint alleges that Visa's exclusionary conduct allows it to maintain high margins—83% operating margins in North America—and durable market shares—60% or higher.  *Id.*¶¶ 164, 166.  The Complaint also provides examples of Visa imposing new, unfavorable debit pricing structures without losing debit volume.  *Id.* ¶ 175.  Visa's ability to increase its prices without losing volume to ACH, RTP, and FedNow is evidence that they are not viable economic substitutes and that debit network services is a distinct product market.  *See, e.g.*, *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("[T]he ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.").

ACH, FedNow, and RTP are not in the relevant markets because they are neither reasonable alternatives in a functional sense nor economic alternatives.  The Complaint adequately explains why Visa's arguments to the contrary fail on both counts.  Compl. ¶¶ 115–116, 159.  The Complaint's allegations establish that ACH, FedNow, and RTP are not just different than debit (or a lower-quality or lower-priced facsimile of debit), but are <u>not reasonably interchangeable</u> in the marketplace with debit network services, even if they may share some functional similarity.  *See Regeneron*, 96 F.4th at 341; *FTC v. Tapestry, Inc*., 2024 WL 4647809, at *11 (S.D.N.Y. Nov. 1, 2024) (whether "'differences are actually a spectrum of price and

quality differences' within an otherwise indivisible market" is "a question of fact, not a question of law") (collecting cases).

### 1. Visa's Other Cases Are Inapposite

The cases Visa cites do not help it. As discussed, *Regeneron* supports the United States, not Visa. And the Complaint alleges why certain product qualities are necessary to provide a service, unlike the complaints in the cases Visa cites. For example, in *Jacobs v. Tempur-Pedic Int'l, Inc*., the plaintiff included a single "conclusional statement" to support its alleged market, unlike the Complaint's detailed allegations. 626 F.3d 1327, 1338 (11th Cir. 2010). In *Hicks v. PGA Tour, Inc.*, plaintiffs failed to plausibly allege that advertisements directed at golf fans played during golf tournaments were not reasonably interchangeable with other types of advertisements directed at golf fans, 897 F.3d 1109, 1116, 1121 (9th Cir. 2018), which contrasts with the Complaint's allegations that ACH, FedNow, and RTP have fundamentally different capabilities. The plaintiffs in *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.* relied on "economically meaningless" differences, 889 F.2d 524, 528 (4th Cir. 1989), unlike the critical differences alleged in the Complaint. The remaining cases attempted to a define a relevant market in terms of a single brand name product, which the United States does not do here. *See Streamcast Networks, Inc. v. Skype Techs., S.A*., 547 F. Supp. 2d 1086, 1094–95 (C.D. Cal. 2007); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001); *Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997).

### 2. The Alleged Markets are Consistent

Visa incorrectly argues that the alleged markets must be rejected due to claimed inconsistencies. Br. at 15–17. Visa's first, fourth, fifth, and sixth so-called inconsistencies are a repackaging of its contention that the United States improperly excluded ACH, FedNow, and

RTP from its market definitions, and thus, fail for the reasons discussed above.  Further, the market is defined by a set of minimum services.  A product that provides those services is in the market; one that does not provide them is not in the market.  Additionally, there is no inconsistency in excluding ACH, FedNow, and RTP, but including other fintech debit products that use ACH, FedNow, or RTP as their rails.  *See* Br. at 16.  The Complaint explains that these fintech products are reasonable substitutes for debit network services because they, unlike ACH, FedNow, and RTP, have minimum attributes discussed above, like "fraud detection, dispute resolution, and chargeback services."  Compl. ¶ 159.

Visa's second and third claimed inconsistencies, *see* Br. at 15–16, also fail because the United States is not required to detail each minimum attribute for every product in its markets to allege that ACH, RTP, and FedNow do not offer these services.  Visa's assertion that debit networks must provide these services "uniformly" to compete in the same antitrust market is unsupported by any authority.  *Id.*  Ultimately, a product must have the minimum attributes as defined in the Complaint to be in the relevant product markets.

### B.  The Complaint Adequately Alleges That Visa Has Engaged in Anticompetitive Conduct

Visa attacks two kinds of exclusionary conduct out of many alleged in the Complaint: Visa's routing agreements with merchants and their banks and Visa's agreements that dissuade potential competitors from competing.  Visa's narrow arguments ignore the Complaint's allegations about its exclusionary agreements with issuers, as well as several components of its anticompetitive conduct toward merchants and their banks, including leveraging incentives on credit card transactions to obtain debit routing and imposition of new fee structures.  Likewise, Visa addresses only some of its agreements with potential competitors, ignoring other agreements and Visa anticompetitive relationships with tech giants like Amazon described in the

Complaint.  Compl. ¶ 112, 135.  Visa's narrow focus obscures "the mix of the various ingredients of [Visa's] behavior," which form a broader course of anticompetitive conduct.  *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928–929 (2d Cir. 1981) (cleaned up); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (Sherman Act plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") (cleaned up).  Visa's failure to address wide swaths of the alleged conduct or dispute that conduct's plausible illegality should alone doom its motion.  Moreover, the conduct Visa does address actually supports plausible Sherman Act claims, as discussed below.

    **1.  The United States Properly Pleaded that Visa's Routing Agreements Violate Sections 1 and 2 of the Sherman Act**

Visa's agreements requiring merchants and acquirers to route all or nearly all eligible debit transactions over the Visa network, violate Sections 1 and 2 because their de facto exclusivity forecloses competition from other networks.  That exclusivity harms competition by depriving rival debit networks of scale that would make them stronger rivals and shielding Visa's debit business from having to respond to competitive pressures like lower prices and higher quality.

Courts have established clear principles for analyzing exclusive dealing arrangements under the antitrust laws.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29 (1961).  And these principles apply equally to express and de facto exclusivity agreements.  *See ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

Visa ignores the Complaint's well-pleaded exclusive-dealing claim by wrongly re-casting the allegations as a predatory pricing scheme, contending that the United States must show Visa sets per-unit prices below cost.  Br. at 18.  Not so.  Where, as here, a plaintiff alleges competition

is harmed because of a "loyalty scheme," it is the exclusivity of the scheme, rather than the monopolist's "prices standing alone," that is illegal. *In re Surescripts Antitrust Litig*, 608 F. Supp. 3d 629, 642–643 (N.D. Ill. 2022); *see also ZF Meritor*, 696 F. 3d at 281 (exclusivity may harm competition on its own "irrespective of below-cost pricing"); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 579 (E.D. Pa. 2018) (plaintiffs properly pleaded that the "exclusivity of the arrangements" harms competition, "not price competition"). Through its agreements that threaten customers with punitive rack rates and penalties if they shift transactions away from Visa—thereby creating de facto exclusive agreements—Visa has foreclosed competition even from rivals that offer lower per-transaction pricing. *See* Compl. ¶¶ 80–81 (explaining mathematically how back-of-card networks are often unable to compete with Visa).

Courts treat loyalty rebate arrangements like Visa's as exclusive dealing and apply the rule-of-reason principles described above unless price itself is the "clearly predominant mechanism of exclusion." *ZF Meritor*, 696 F.3d at 277, 281; *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 32–33 (S.D.N.Y. 2016). Only then would a court consider applying the price-cost or discount-attribution tests that Visa embraces. *See, e.g.*, *ZF Meritor*, 696 F.3d at 277–281; *FTC v. Syngenta Crop Protection AG*, 711 F. Supp. 3d 545, 574–77 (M.D.N.C. 2024); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 229 (D.D.C. 2022); *In re Surescripts*, 608 F. Supp. 3d at 642–43; *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101 (D.D.C. 2020) (rejecting argument that "loyalty programs are unlawful only when they constitute 'predatory' pricing"); *In re Remicade*, 345 F. Supp. 3d at 579; *Dial*, 165 F. Supp. 3d at 32–33.

Determining whether price is the clearly predominant mechanism of exclusion must be made "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Syngenta*, 711 F. Supp. 3d at 578 (cleaned up). Moreover, that "loyalty discounts cover a single

product . . . does not necessarily mean that price clearly predominates." *Id.* at 577.  In assessing whether price or exclusivity predominates (typically after full development of the record), courts consider a range of factors, many of which have been extensively alleged in the Complaint, including:

(1)  Visa's agreements exploit its dominant share of a market protected by high entry barriers.  Compl. ¶¶ 5–6, 55, 100; *see Syngenta*, 711 F. Supp. 2d at 576–77 (one of the "non-price mechanisms of exclusion" was the leveraging of the "Defendants' monopolist status" and high barriers to entry).

(2)  Visa's contracts use a "cliff pricing" structure, which penalizes non-exclusivity because even a slight deviation from the share target can deprive the customer of all the discounts it has earned and revert to Visa's high rack rate pricing.  Compl. ¶¶ 75–79; *see ZF Meritor*, 696 F.3d at 265 (analyzing rebates conditioned on meeting market share target under the rule of reason).

(3)  Many of Visa's contracts contain early termination or clawback terms, which allow Visa to terminate the contract and force the customer to repay the incentives it received previously.  Compl. ¶ 77; *see Syngenta*, 711 F. Supp. 3d at 576 (recognizing "threats to retract unpaid rebates or claw back discounts" are "non-price mechanisms of exclusion" analyzed under the rule of reason).

(4)  The high proportion of non-contestable transactions on Visa debit cards give it the leverage to capture all the *contested* volume by threatening punitive rack rates on non-contestable transactions and providing incentive payments on both.  Compl. ¶¶

58, 79; *see Remicade*, 345 F. Supp. 3d at 578–79 (rule of reason applied to discount scheme that linked contestable and incontestable prescriptions).[1]

(5) The wide coverage of Visa's arrangements (foreclosing about half the volume in the debit market) raises the costs of other networks to compete because, to win business, they must not only offer lower prices but also compensate the merchant for the penalties Visa imposes for non-exclusivity.  Compl. ¶¶ 83, 102–103; *see Syngenta*, 711 F. Supp. 3d at 574–75 (rule of reason applies when agreements "exclude competition by imposing unilateral costs on competitors").

(6) Visa's incentive agreements can last for a very long time.  ███████████████

███████████████████████████████████████

███████████████   *see Syngenta*, 711 F. Supp. 3d at 576 (listing "the length of time of the discounting agreements" as a "non-price mechanism of exclusion" in the rule of reason determination).

Visa asks the Court to assume at the outset of the case that price is the predominant method of exclusion, despite the Complaint's well-pleaded allegations and the fact-bound nature of that analysis.  Br. at 18.  That is improper.  *See Oakley*, 980 F.3d at 283.  Relying on this unfounded assumption, Visa asks the Court to apply tests that measure whether a monopolist's pricing is so low that it drives competitors out of the market.  *See* Br. at 18–20.  Those tests do

---

[1] Visa mischaracterizes the Complaint by calling the allegations about contestable and non-contestable transactions a bundling claim.  Br. at 19.  The Complaint nowhere alleges that.  Rather, the Complaint makes clear that non-contestable transactions are a key source of Visa's leverage to capture routing of contestable transactions.  Compl. ¶¶ 10–12, 79, 102.

not apply here because, unlike the cases applying those tests, this case alleges that Visa's prices are too <u>high</u> because its conduct has hampered competition, not that it is maintaining a monopoly by pricing too <u>low</u>.  *See Pulse Network, LLC v. Visa Inc.*, 30 F.4th 480, 492, 494–95 (5th Cir. 2022) (distinguishing predatory pricing cases on grounds that "Pulse isn't complaining about low prices but about high prices—*i.e.,* the supra-competitive overall prices Visa can charge merchants by exploiting its dominance"); *In re Surescripts*, 608 F. Supp. 3d at 642.

Visa similarly asserts that its cost-based tests apply because its "[d]iscounts attached merely to the quantity of goods purchased, and not to exclusivity itself."  Br. at 20.  But the factors outlined above show that the loyalty scheme alleged is, in fact, designed to reward (and compel) exclusivity itself.

After making this erroneous assumption, Visa relies on cases where a monopolist's pricing is so low that it drives competitors out of the market—cases involving very different legal theories and factual settings, such as predatory pricing (*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); (*Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093 (S.D.N.Y. 2019)),[2] predatory bidding (*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007)) and tying (*Collins Inkjet Corp. v. Eastman Kodak*

---

[2] The portion of *Valassis* cited by Visa considered a "standalone claim of Predatory Pricing." The court went on to hold that though the plaintiff did not present evidence of below-cost pricing, a jury nevertheless could find harm to competition from defendant's contracts that "prevented [competitors] from obtaining a critical mass of [customers]."  2019 WL 802093, at *5, 12.  That triable issue is similar to the allegations pleaded here.

*Co.*, 781 F.3d 264 (6th Cir. 2015))—not the loyalty rebates alleged.  Br. at 18–20.  Although the Complaint alleges that Visa uses exclusivity, rather than low prices, to exclude competition, Visa's motion at best raises a factual dispute about whether exclusivity or price predominates.  In exclusive dealing cases, courts resolve such disputes before discovery "in only rare circumstances."  *Syngenta*, 711 F. Supp. 3d at 579.  The dispute should be resolved at trial, as courts have held in two prior challenges to Visa's routing agreements.  *See Pulse*, 30 F. 4th at 494–95 (holding "what to make of Visa's agreements with merchants and issuers is a fact question for a jury, not a summary judgment issue for a court"); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 729 F. Supp. 3d 298, 311–12, 331–33 (E.D.N.Y. 2024)) (denying summary judgment on Section 2 challenge to Visa's post-Durbin Amendment routing agreements with merchants and acquirers).

### 2. Visa Stifles Innovation and Competition Through Unlawful Agreements Not to Compete

The Complaint plausibly alleges that Visa neutralizes emerging threats to its dominance by offering these potential competitors a "quid pro quo": incentives in exchange for not competing with Visa.  Compl. ¶¶ 111–112.  And to give that proposition teeth, Visa threatens burdensome fees if would-be rivals develop competing payment networks.  Compl. ¶¶ 113–137.  Agreements between an incumbent and its potential competitor, in which the potential competitor receives benefits from the incumbent in exchange for not competing, harm competition and violate Section 1 of the Sherman Act.  *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) ; *see also FTC v. Actavis, Inc.*, 570 U.S. 136, 158 (2013).  A monopolist paying off its potential or actual competitors to prevent expansion into the market likewise violates Section 2 of the Sherman Act.  *United States v. Google LLC*, 2024 WL 3647498, at *116–117 (D.D.C. 2024).

The United States does not allege that Visa harms competition by refusing to deal with anyone, notwithstanding Visa's assertions to the contrary, Br. at 22–23.  The refusal-to-deal doctrine, which is a narrow "court-made subcategor[y] of [anticompetitive] conduct," distinct from ordinary rule-of-reason analysis, *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024), is intended to apply only to situations where a monopolist "fail[s] to come to [a rival's aid]," not where a monopolist "fail[s] to leave its rivals alone," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072–73 (10th Cir. 2013); *see also Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438, 450 (2009) (characterizing claims at issue as a monopolist rendering "insufficient assistance" to a competitor).  Unlike in *linkLine* and other refusal to deal cases, the Complaint does not allege that Visa rendered insufficient assistance to its competitors, but instead that Visa paid them to refrain from becoming competitors in the first place.  Compl. ¶ 111–112.  Visa's alleged conduct thus changed the trajectories of its potential rivals and harmed competition.  *Id.* ¶¶ 119–137; *see also Google*,  2024 WL 3647498, at *116–117 (revenue-sharing arrangement with Google "unquestionably" discouraged Apple "from launching its own search engine").

    a.    <u>Visa Has a Broad, Longstanding History of Suppressing Potential Rivals</u>

Visa ignores the Complaint's allegations regarding its long contractual history with Apple, PayPal, Square, and other large technology companies, instead focusing only on some of the current agreements with a few of these companies and disregarding the allegations of Visa's intent in entering these contracts.  In analyzing whether an agreement harms competition, a court must consider "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed."  *Nat'l Soc'y of Prof'l Engrs. v. United States*, 435 U.S. 679, 692 (1978).  Visa

ignores those broader allegations and instead narrowly focuses only on the current agreements with some of these companies.

Through the negotiation and performance of earlier agreements with Apple, PayPal, and Square (and others), Visa made clear that its potential rivals would face penalties if they threatened Visa's debit monopoly.  *E.g.*, Compl. ¶¶ 119–137.  This conduct was all part of Visa's strategy to maintain its monopoly and assuage Visa's fears that "fintech debit networks would displace Visa as an intermediary."  *Id.* ¶ 113.  Visa's internal documents, detailed in the Complaint, show that Visa developed contractual incentive structures with potential rivals to reward them for not competing against Visa and to penalize them if they took steps toward developing competing debit networks.  *Id.* ¶¶ 119–137.  These allegations of "anticompetitive animus," which Visa's motion ignores, are integral to the Court's evaluation of the "probability of anticompetitive effects."  *See PharmacyChecker.com, LLC v. Natl Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 346 (S.D.N.Y. 2021).

The Complaint's allegations about Visa's relationships with PayPal and Square, in particular, demonstrate that Visa can—and does—use a variety of tools to discourage companies from promoting technologies that Visa considers threatening.  For example, when PayPal launched a staged digital wallet that allowed customers to load funds without using traditional debit credentials, Visa retaliated by imposing new restrictions on PayPal and threatening higher fees if PayPal did not meet new, more stringent volume targets.  *Id.* ¶¶ 119–132.  Although Visa modified restrictions on PayPal in its most recent contract (entered during the investigation that led to this Complaint), Visa's motion nevertheless ignores the allegations about its earlier dealings with PayPal and how those dealings continue to impact competition and the parties' understanding of current agreements.  *Id.*  Visa likewise ignores the allegations that in 2014, Visa

21

threatened to terminate its incentive agreement with Square unless Square withdrew a newly

launched product that Visa feared was a "disintermediation threat." *Id.* ¶¶ 127–131.

b.  <u>The Agreements Visa Attaches to Its Motion Support Sherman Act Claims<br>Because They Reward Potential Rivals for Not Competing</u>

Agreements violate the Sherman Act when they "appear[] capable of significantly

contributing to keeping [a potential competitor] on the sidelines [], thus allowing [the

monopolist] to maintain its monopoly." *Google*, 2024 WL 3647498, at *117.  As the Complaint

alleges, based on the text of agreements with Apple, PayPal, and Square, those agreements and

others do just that, thereby harming competition.  Compl. ¶¶ 113–137.  Visa tries to avoid that

plausible inference by cherry-picking some of these agreement's terms, which is improper

because it "risks depriving the parties of a fair adjudication of the claims by examining an

incomplete record." *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154–55 (2d Cir. 2002).

But even the few contractual clauses Visa quotes and attaches to its motion confirm the United

States met its burden to plead facts.  Visa entered agreements with potential competitors that

induced those competitors to not compete either by penalizing when they do or rewarding them

when they don't.

For example, Visa admits that if Apple ███████████████████████████████

████████████████████████████████████████████████ the Visa Global

Strategic Merchant Incentive Agreement ("Merchant Incentive Agreement").  Br. at 23 (quoting

Exh. 3 ██████████).  As an initial matter, and a reason why factual matters should not be

taken up on a motion to dismiss, Visa failed to attach a critical addendum (Program Addendum 2:

U.S. Territory) containing additional information on financial incentives.  Nevertheless,

████████████████████████████████████████████████████

████████████████████████████████████████████

22

███████████████████████████████████████████████████████

███████████████████████████████████████ *Id.*  But terminating the Merchant

Incentive Agreement would cost Apple hundreds of millions of dollars.  Compl. ¶ 136.

Visa's motion also references its Payment Platform Agreement with Apple (which Visa

calls the "Technology Agreement"), attaching an incomplete copy of that agreement to its

motion.[3]  This agreement ███████████████████████████████████████████

███████████████████████████████████████████ Visa

acknowledges its right to "walk away" from this Agreement—and deprive Apple of fees from

issuers—if Apple decides to "develop[] a competing network."  Br. at 22.  This provides a carrot

to Apple not to compete with Visa, which accompanies the stick of Visa threatening to cancel the

Merchant Incentive Agreement if Apple hazards to compete with Visa.

Visa's current agreements with PayPal and Square also show monopolistic intent and

anticompetitive effects.  Among other provisions, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████  Visa likewise threatens to impose fees on and withhold incentives from Square if

Square steers customers toward payment options that bypass the need for Visa or traditional

debit networks.  Compl. ¶ 132.  Visa recognizes its threats to impose such fees influence the

behavior of its potential competitors and deter them from competing.  Compl. ¶ 125.

---

[3] Visa's brief discusses a different version of Amendment 9 from the version attached as Br.
Exhibit 2.

## V.    <u>CONCLUSION</u>

For the reasons stated above, Visa's Motion to Dismiss should be denied.

DATED: January 19, 2025                              Respectfully submitted,


<u>By:      /s/ Aaron Teitelbaum</u>
Aaron M. Teitelbaum
Bennett J. Matelson
Michele Trichler
Robert Vance
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Telephone: (202) 894-4266
Facsimile: (202) 514-7308
<u>Aaron.Teitelbaum@usdoj.gov</u>
<u>Bennett.Matelson@usdoj.gov</u>
<u>Michele.Trichler@usdoj.gov</u>
<u>Robert.Vance@usdoj.gov</u>


*Counsel for Plaintiff, the United States*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify under Section II.D of Judge Koeltl's individual practices that this memorandum contains 6,963 words, exclusive of the cover page, table of contents, table of authorities, and this certification. I further certify that this memorandum complies with the formatting rules provided in Section II.D of Judge Koeltl's individual practices.

By:      <u>/s/ Aaron Teitelbaum</u>
Aaron M. Teitelbaum