UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>VISA INC.,<br><br>    *Defendant.* | Case No. 1:24-cv-07214-JGK-SLC<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF VISA INC.'S
MOTION TO DISMISS**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ............................................................................................................................1

I.      THE GOVERNMENT'S ALLEGED PRODUCT MARKET IS IMPLAUSIBLE. ........................................................................................................1

        A.      The Court Should Not Adopt the Government's "Minimum Attributes" Test. .......................................................................................1

        B.      The Functional Similarity of Interbank Payment Networks to Other Debit Networks Is Relevant. ..................................................................2

        C.      The Government's Market-Power Allegations Are Irrelevant. ....................2

        D.      The Government Concedes Its Allegations' Inconsistencies. ......................3

II.     THE GOVERNMENT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT. .........................................................................................................4

        A.      The Government's Challenge to Visa's Merchant Agreements Is a Challenge to Visa's Pricing. ...........................................................................4

        B.      The Government Cannot Rely on Expired Agreements to Resuscitate its "Agreements-Not-To-Compete" Challenge. .........................7

              1.      Apple ........................................................................................................7

              2.      PayPal .......................................................................................................9

              3.      Square .......................................................................................................9

        C.      Visa's Other Alleged Conduct Does Not Constitute an Antitrust Violation. ....................................................................................................10

CONCLUSION ......................................................................................................................11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................. 10

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .................................................................................................................... 2

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ................................................................................................ 4, 11

*City of Groton v. Conn. Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) ..................................................................................................... 11

*Cohen v. Primerica Corp.*,
  709 F. Supp. 63 (E.D.N.Y. 1989) ............................................................................................... 2

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .................................................................................................... 4

*Dean v. Blumenthal*,
  577 F.3d 60 (2d Cir. 2009) ......................................................................................................... 7

*FTC v. Syngenta Crop Protection*,
  711 F. Supp. 3d 545 (M.D.N.C. 2024) ............................................................................... 5, 6, 7

*FTC v. Tapestry, Inc.*,
  2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) .............................................................................. 2

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  729 F. Supp. 3d 298 (E.D.N.Y. 2024) .................................................................................... 6, 7

*In re Remicade Antitrust Litig.*,
  345 F. Supp. 3d 566 (E.D. Pa. 2018) ...................................................................................... 5, 7

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ................................................................................................ 5, 7

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .................................................................................................. 8

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) .................................................................................................................. 10

*Pulse Network, LLC v. Visa Inc.*,
    30 F.4th 480 (5th Cir. 2022) ................................................................................................ 6, 7

*Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*,
    96 F.4th 327 (2d Cir. 2024) ................................................................................................. 1, 2

*Valassis Commc'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ............................................................................ 11

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) .................................................................................................................. 4

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ................................................................................................ 4, 6

### Other Authorities

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (5th ed. 2024) .......................................................................5

**INTRODUCTION**

The Government's rhetoric cannot remedy its failure to address core deficiencies in its Complaint. Among other things, the Government:

- Ignores fundamental inconsistencies in its market-definition allegations, instead relying on a "minimum attributes" test that is contrary to law;

- Repackages its challenge to Visa's prices—bending the caselaw and its own allegations—to suggest without support that Visa's merchant agreements contain non-price terms that could plausibly support an antitrust claim; and

- Asks the Court to disregard explicit terms in Visa's agreements with Apple, PayPal, and Square in favor of contrary terms in long-expired agreements or statements allegedly made during decade-old negotiations.

This attempted misdirection only confirms the Government's claims should be dismissed.

**ARGUMENT**

**I.   THE GOVERNMENT'S ALLEGED PRODUCT MARKET IS IMPLAUSIBLE.**

The Government's product-market arguments ignore the law and its Complaint's own fundamental inconsistencies.

**A.      The Court Should Not Adopt the Government's "Minimum Attributes" Test.**

The Government's "minimum attributes" test is contrary to law. Opp. 9. Courts regularly dismiss claims where plaintiffs define the market solely by reference to minimum attributes. MTD 13–14.

None of the cases cited by the Government even discuss a "minimum attributes" test, let alone adopts it. Opp. 8-12. In *Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*, the Second Circuit held plaintiffs' allegations were sufficient because they alleged: (1) a hypothetical monopolist could impose a small but significant non-transitory increase in price without losing sales to the excluded products; and (2) the proposed market satisfied *Brown Shoe*'s "practical

1

indicia" test. 96 F.4th 327, 339–41 (2d Cir. 2024) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In *FTC v. Tapestry, Inc.*, the district court likewise applied the "practical indicia" test. 2024 WL 4647809, at **11–24 (S.D.N.Y. Nov. 1, 2024).

The Government's claims should be dismissed because its market-definition allegations do not satisfy "established legal frameworks such as the 'hypothetical monopolist' test or the *Brown Shoe* factors." *Regeneron*, 96 F.4th at 340.

### B. The Functional Similarity of Interbank Payment Networks to Other Debit Networks Is Relevant.

The Government incorrectly asserts that the functional similarity of Interbank Payment Networks to other debit networks is irrelevant. Opp. 10. Two products' functional similarity is a "*prima facie* indication that two products may be in the same market." *Regeneron*, 96 F.4th at 340. When functional similarity exists, as it indisputably does here, the plaintiff must allege meaningful "economic factors" to plausibly exclude Interbank Payment Networks. *Id*. The Government has failed to do that.

### C. The Government's Market-Power Allegations Are Irrelevant.

The Government's last-ditch attempt to exclude Interbank Payment Networks is to repackage its market-power allegations as market-definition allegations. Opp. 11. This flawed approach cannot resuscitate its claims.

The Government asserts without legal support that Visa's alleged market share and operating margins warrant exclusion of Interbank Payment Networks. Opp. 11. But that puts the cart before the horse: "When examining market share, a court must *first* determine the parameters of the relevant market, and *then* examine the defendant's share in that market." *Cohen v. Primerica Corp.*, 709 F. Supp. 63, 66 (E.D.N.Y. 1989) (emphasis added). The Government's market-share

2

allegations are circular because they are premised on excluding Interbank Payment Networks from the relevant market. Nor has the Government cited any case where market share or operating margins were deemed relevant to market definition, as opposed to market power.

The Government also suggests that it has properly defined the market because "Visa has successfully imposed new, unfavorable pricing structures without losing debit volume." Compl. ¶ 175; Opp. 11. But that allegation makes no mention of Interbank Payment Networks. And by the Government's logic, PIN Networks should *also* be excluded from the relevant market, because allegedly raising prices did not cause Visa to lose volume to PIN Networks either. But the Government does not suggest excluding PIN Networks from the relevant market, because its theory of anticompetitive harm necessitates including PIN Networks.

### D. The Government Concedes Its Allegations' Inconsistencies.

The Government does almost nothing to reconcile or explain the numerous inconsistent allegations identified in Visa's opening brief, MTD 14–17, relying instead on its legally unsupported "minimum attributes" test. Opp. 12–13.

The Government, for example, fails to address its inclusion of PIN Networks in the relevant market even though its own allegations concede these networks lack sufficient fraud protection, Compl. ¶¶ 101, 105, one of the Government's identified "minimum attributes." Nor can it explain why slower processing times warrant excluding ACH from the market, but not Fintech Debit Networks that *rely* on ACH—and thus necessarily process transactions at the same speed. *Id.* ¶¶ 61, 156, 159.

The Government's implicit concession that its core market-definition allegations are contradictory independently requires dismissal.

## II.     THE GOVERNMENT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT.

### A.     The Government's Challenge to Visa's Merchant Agreements Is a Challenge to Visa's Pricing.

The Government appears to agree that its challenge to Visa's volume-based discounts only survives if it plausibly alleges that the relevant merchant agreements contain non-price terms sufficient to establish an antitrust violation. But the purportedly non-price terms it identifies, Opp. 16–17, do not satisfy that requirement.

**Market Share and Entry Barriers.** Having a high share of a market with high entry barriers is not an antitrust violation, and courts routinely apply the price-cost and discount-attribution test to price discounts offered by alleged monopolists. *See, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 315–19 (2007) (65% market share); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 891, 907 (9th Cir. 2008) (75% market share).

**"Cliff Pricing."** All volume-based discounts come with a "cliff"—the point at which the discount will not be earned because the volume threshold is not met. Nonetheless, courts routinely apply the price-cost test to volume-based discounts. *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060–63 (8th Cir. 2000). The only case the Government cites—*ZF Meritor, LLC v. Eaton Corp.*—declined to apply the price-cost test not because the defendant engaged in "cliff pricing" but because of the defendant's other non-price conduct, including threatened supply shortages. 696 F.3d 254, 265–67, 277, 281 (3d Cir. 2012).

**Early-Termination Fees.** Though the Government does not allege what portion of Visa's agreements have early-termination fees, any such fees are nonetheless price terms. Even accepting the Government's allegations, early-termination fees are repayments of some "incentives that Visa

4

had previously paid the merchant." Compl. ¶ 77. In other words, early-termination fees allow merchants to receive discounts earlier rather than rebates later.

The Government's citation to *FTC v. Syngenta Crop Protection AG*, Opp. 16, is unavailing because *Syngenta* did not involve early-termination fees; it only included "threats to retract unpaid rebates or claw back discounts" in an exemplary list of potential non-price terms. 711 F. Supp. 3d 545, 576 (M.D.N.C. 2024). Tellingly, the Government does not mention *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), the case *Syngenta* cited for this example. For good reason: In *McWane*, the defendant unilaterally imposed repayments; there was no pre-negotiated early-termination fee in the agreements. Moreover, similar to *ZF Meritor*, the defendant threatened to "cut off" distributors from its supply for twelve weeks if the distributors bought from an emergent competitor. 783 F.3d at 820–21.

**"Non-Contestable" Transactions.** The Government has cited no legal support for its assertion that the inclusion of "contestable" and "non-contestable" transactions in a single volume-based discount is a non-price term. The Government's only cited case—*In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566 (E.D. Pa. 2018)—does not address the question of price predominance.

In any event, to the extent single-product bundling raises antitrust concerns, the leading antitrust treatise explains that courts should apply the discount-attribution test to evaluate such "bundles." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 749e (5th ed. 2024) (where a discount that groups "contestable" and "incontestable" demand is challenged, apply the discount-attribution test—*i.e.*, "attribute the

5

entire discount to the goods that are still in competitive play"—to determine whether the discount could plausibly drive out equally efficient competitors).

**Rivals' Costs.** The Government claims that anything that imposes a unilateral cost on a competitor is a non-price term. The Government's only purported support for that illogical proposition is a quote from *Syngenta*. Opp. 17. But the Government omitted a crucial part of that quote, which recommends applying "*the rule of reason where there are mechanisms beyond price-cutting* that exclude competition by imposing unilateral costs on competitors." 711 F. Supp. 3d at 574 (excluded language emphasized). As the full quote makes clear, the imposition of costs on competitors is only relevant if those costs are imposed by non-price terms. And the Government has not explained how Visa's discounts, which allegedly raise its competitors' costs, are non-price terms.

**Agreement Length.** The Government's reliance on three agreements attached to Visa's motion to dismiss to support its assertion that "Visa's incentive agreements can last for a very long time" is inapt. Opp. 17. The Complaint does not allege anything about the duration of hundreds of routing agreements at issue. Nor has the Government cited any case holding that agreement length by itself is sufficient to avoid application of the price-cost and discount-attribution tests.

The Government attempts to recharacterize its price-based claims as exclusive dealing claims, but every case the Government cites involved severe, non-price-based methods of exclusion that are not alleged here.[1] *ZF Meritor*, 696 F.3d at 277 (threatened supply shortages);

---

[1] The Government cites *Pulse Network, LLC v. Visa Inc.*, 30 F.4th 480 (5th Cir. 2022), and *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298

6

*Syngenta*, 711 F. Supp. 3d at 576–77 (same); *McWane*, 783 F.3d at 820–21 (same); *Remicade*, 345 F. Supp. 3d at 575 ("fail first" provision prohibiting medical providers from prescribing competing medications unless the patient did not respond to defendant's medication). These cases only confirm that the price-cost or discount-attribution test should be applied to Visa's volume-based discounts.

**B. The Government Cannot Rely on Expired Agreements to Resuscitate its "Agreements-Not-To-Compete" Challenge.**

The Government asserts that Visa pays Apple, PayPal, and Square not to compete with its debit products. Opp. 20. But the Government does not identify provisions in *operative* agreements establishing that alleged *quid pro quo*, instead relying on expired provisions in non-operative agreements and "threats" allegedly made in decade-old negotiations. This approach lacks legal support and would be particularly problematic here because the Government seeks only forward-looking relief. *See* Compl. ¶ 203; *Dean v. Blumenthal*, 577 F.3d 60, 64 (2d Cir. 2009).

**1. Apple**

The Government has not identified any agreement where Visa pays Apple not to compete.[2]

---

(E.D.N.Y. 2024), but neither decision discusses price predominance. *Pulse*, moreover, evaluated only standing and "assume[d] *arguendo* that [Visa's] policy violates the antitrust laws." 30 F.4th at 488. And the *In re Payment Card* court applied the discount-attribution test to Visa's routing agreements. 729 F. Supp. 3d at 325 n.17.

[2] The Government does not rely on any prior Apple agreements or negotiations and does not explain the import of Visa's alleged failure to address some current Apple agreements. Opp. 22–23.

The Government barely grapples with the scope or conditions of the Apple Merchant Agreement. MTD Ex. 3. That agreement, among other things, governs ███████████ ███████████████████████████████████████; it does not involve █████ █████████, let alone ███████████████████████████████████████████████████. In other words, the Apple Merchant Agreement cannot be an "agreement not to compete" because it does nothing to inhibit Apple from launching its own debit product and competing for what the Government describes as "billion[s] in network fees." Compl. ¶ 64.

To the extent the Government suggests that the Apple Technology Agreement involves ███████████████████████████, that is incorrect. Though it does not cite to any specific provision, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

The Government, moreover, cannot explain why the antitrust laws require Visa to continue dealing with Apple if Apple becomes a direct competitor. It cites only one case for the proposition that a monopolist may "be held liable for failing to leave its rivals alone." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.). But a breath before, that decision—which rejected the plaintiff's antitrust challenges—explained that businesses are free to decide "whether or not to do business with others," "free to assign what prices they hope to secure for their own products," and free to withhold their "intellectual property" from rivals. *Id.* at 1072–74, 1076–77.

If Apple becomes a competitor, Visa is entitled to terminate or re-negotiate their business relationship.

8

### 2. PayPal

The Government does not cite any provision in the PayPal Agreement prohibiting PayPal from creating an ACH-based payment method that competes with Visa.

The best the Government musters is its assertion that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Opp. 23. The contract does not say that. PayPal currently allows consumers to make in-person ACH-based payments through use of a QR code. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

Seemingly recognizing that this provision is insufficient to support its challenge, the Government relies on alleged "restrictions" on ACH-based payments in an agreement that expired in 2021, including a "restrict[ion] [on] in-store ACH funding transactions to a QR code model." Compl. ¶ 123. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

### 3. Square

The Government alleges that the Square Agreement prohibits Square from "steer[ing] customers toward payment options that bypass the need for . . . debit networks." Opp. 23. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ This cannot be the basis for an

antitrust claim because "there is nothing inherently anticompetitive about . . . antisteering provisions." *Ohio v. Am. Express Co.*, 585 U.S. 529, 551 (2018).

Nor does the Government's allegation about a nearly decade-old negotiation with Square change anything. The Government alleges that, in 2016, Visa threatened to terminate the Square agreement if Square released a competing product. Opp. 21–22. Nothing in the antitrust laws prohibits Visa from terminating an agreement with a competitor. MTD 22. Moreover, it strains credulity to suggest the Court should ignore explicit terms of a current agreement based on a contrary statement allegedly made nine years ago.

### C. Visa's Other Alleged Conduct Does Not Constitute an Antitrust Violation.

The Government wrongly suggests that its Complaint should survive because Visa allegedly only tackles "two kinds of exclusionary conduct out of many." Opp. 13.

The Government states that Visa has not addressed its alleged inducement of issuers to "limit the enablement of rival networks" with contracts offering discounts and other volume incentives. Opp. 6, 13. But Visa's issuer agreements cannot be exclusive because the Durbin Amendment requires issuers to enable two unaffiliated debit networks on every debit card. MTD 4 (citing Compl. ¶ 8). In any event, as with Visa's merchant agreements, the Government does not allege that Visa's issuer discounts are below cost.

The Government asserts Visa has "anticompetitive relationships" with Amazon, but the Complaint only makes a cursory reference to Amazon. Compl. ¶ 135. These "bare assertions" are "conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

The Government's threadbare allegations of credit and debit bundling likewise include no factual assertions indicating that claim could survive the discount-attribution test. *See*

*PeaceHealth*, 515 F.3d at 907–09 (bundling claim only anticompetitive if it survives the discount-attribution test).

Finally, to the extent the Government asserts a so-called "monopoly broth" theory, this also fails. Even if the issues raised by the Government "are interrelated and interdependent," the Court must "analyze the various issues individually." *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981). And "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth.'" *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019).

## **CONCLUSION**

The Government's Complaint should be dismissed.

DATED: February 7, 2025                    Respectfully submitted,


/s/ *Beth A. Wilkinson*
Beth Wilkinson (SBN NY 2181592)
Brian Stekloff (admitted *pro hac vice*)
Kieran Gostin (SBN NY 4847653)
Roxana Guidero (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
rguidero@wilkinsonstekloff.com

Anne P. Davis (*admitted pro hac vice*)
Jonathan Ian Gleklen (*admitted pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone: (202) 942-6197
Facsimile: (202) 942-5999
anne.davis@arnoldporter.com
jonathan.gleklen@arnoldporter.com


*Counsel for Defendant Visa Inc.*

## CERTIFICATION OF COMPLIANCE

I hereby certify under Section II.D of Judge Koeltl's individual practices that this memorandum contains 2,799 words, exclusive of the cover page, table of contents, table of authorities, and this certification. I further certify that this memorandum complies with the formatting rules provided in Section II.D of Judge Koeltl's individual practices.

By: /s/ *Beth A. Wilkinson*
Beth A. Wilkinson