

U.S. Department of Justice

Antitrust Division

*Liberty Square Building*
*450 5th Street, N.W.*
*Washington, DC 20530*

June 2, 2025

**Via ECF**

Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

        Re:    *United States v. Visa Inc.*, Case No. 1:24-cv-07214-JGK
               Addressing *NicSand, Inc. v. 3M Co.,* 507 F.3d 442 (6th Cir. 2007)

Dear Judge Koeltl:

Plaintiff United States appreciates the opportunity to address the case of *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007), which Visa cited for the first time during the Rule 12(b)(6) hearing. For the reasons discussed below, *NicSand* does not support granting Visa's motion to dismiss.

Visa argued that this Court should adopt a price-cost test rather than the rule-of-reason analysis to evaluate certain conduct at issue in this case and cited *NicSand* in response to the Court's request for a case making such a finding at the motion to dismiss stage. *NicSand* stands for the basic proposition that "one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." 507 F.3d at 450. There, the plaintiff challenged three aspects of the defendant's conduct: upfront discounts, multi-year contract terms, and exclusivity. The court's analysis of each shows the clear distinctions with this case.

*Up-front discounts.* First, the court addressed the plaintiff's pricing allegations (the "up-front discounts") separately from the other aspects of the defendant's contracts. 507 F.3d at 451-53, 453-57. The *NicSand* court did not try to analyze an exclusive dealing allegation as if it were a pricing allegation, as Visa seems to suggest this Court should do here. While the court in *NicSand* did consider the price-cost test in its evaluation of defendant's upfront discounts, *id.* at 451-53, this case does not involve allegations about up-front discounts to customers.

*Multi-year terms*. In *NicSand*, the defendant entered into multi-year contracts with customers. *Id.* at 453. The court did not use the price-cost test to analyze this aspect of the defendant's conduct. Instead, the court found that the plaintiff could have offered similar deals to customers, but simply chose not to. *Id.* Here, in contrast, the Complaint alleges that other debit competitors have no ability to compete for transactions that merchants must route exclusively to Visa, even when those competitors could offer a lower per-transaction price. *See, e.g.*, Compl. ¶¶ 77-79.

*Exclusivity.* As with the multi-year terms, the court did not engage in a price-cost analysis of the exclusivity of the agreements. 507 F.3d at 453-57. Indeed, the court acknowledged that "exclusive agreements in some instances may create impermissible barriers for new entrants to a market and may permit a supplier to charge monopoly prices [citing *Tampa Electric*]," *id.* at 454, and further noted that "should 3M use these contracts and its current market dominance to establish unreasonable barriers to entry in the future, a potential competitor might have a legitimate antitrust claim," *id.* at 457. Both of these statements were made without any qualifier as to a price-cost test.

Additionally, when analyzing exclusivity, the court looked to the realities of the market at issue and the effect of the defendant's conduct. The court explained that the de facto exclusive agreements to offer only one brand of sandpaper in *NicSand* were required by the <u>customers</u> (retailers)—not imposed by 3M—and were open to bidding by any of the suppliers. *NicSand*, 507 F.3d at 454 ("If retailers have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against a supplier for acquiescing to that requirement."). The *NicSand* retailers employed de facto exclusive agreements to benefit themselves—3M's customers—to simplify planning and reduce costs. *Id.* at 447-448. By contrast, in this case, there is no allegation that <u>customers</u> (merchants) "made exclusivity a *condition* for doing business with" Visa (*id.* at 454). Rather, Visa is the one using its monopoly power to leverage merchants into accepting the de facto exclusive arrangements. *See, e.g.*, Compl. ¶¶ 73, 79, 102 (alleging that Visa demands and enforces exclusivity from merchants and acquirers). As alleged in the Complaint, Visa imposed de facto exclusive agreements in order to sideline its would-be competitors and protect its monopoly, thereby maintaining its supracompetitive prices and high profit margins. *See id.* ¶¶ 22, 66, 70-74, 98, 165-166.

The *NicSand* court also pointed to the fact that 3M did not have monopoly power when it began entering exclusive arrangements with retailers (rather, it was NicSand that was in the "dominant position"). *NicSand*, 507 F.3d at 455. By contrast, here the Complaint alleges that Visa had monopoly power when it began its exclusive dealing campaign and acted with the goal of blocking out competition and maintaining its monopoly position. Compl. ¶¶ 6-9, 70-79, 95, 167.

Finally, the case of *ZF Meritor v. Eaton*, 696 F.3d 254 (3d Cir. 2012), which applied the rule-of-reason standard over the price-cost test, is a more recent and more factually analogous case than *NicSand*. *ZF Meritor*, as well as *FTC v. Syngenta,* 711 F. Supp. 3d 545 (M.D.N.C. 2024), expressly distinguished *NicSand* in holding that an antitrust challenge to an exclusive dealing program can proceed without a showing of below-cost pricing. *ZF Meritor*, 696 F.3d at 272, 274, 275, 285; *Syngenta*, 711 F. Supp. 3d at 574-76.

In sum, *NicSand* does not support granting Visa's motion to dismiss.

            Sincerely,

            */s/ Craig Conrath*

            Craig Conrath
            U.S. Department of Justice
            Antitrust Division