**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

────────────────────────────────

**UNITED STATES OF AMERICA,**

                  **Plaintiff,**

       **- against -**

**VISA, INC.,**

                  **Defendant.**

────────────────────────────────

**24-cv-7214 (JGK)**

**MEMORANDUM OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

In the not-too-distant past, consumers and merchants transacted primarily using cash. In the 1960s, ATM cards proliferated, enabling cash access at the point of sale. In around 1990, debit cards eliminated the need for cash altogether by enabling consumers to pay for purchases by drawing directly on their bank accounts. More recently, financial technology ("fintech") firms began offering alternatives to debit cards such as PayPal and Cash App Pay.

For decades through today, Visa, Inc. has operated the largest debit network in the United States. This case is about whether, in seeking to increase and protect its debit card network, Visa violated the federal antitrust laws.

The Government brought this action alleging that Visa monopolized and attempted to monopolize the United States market for general purpose debit network services, in violation of Sherman Act § 2, 15 U.S.C. § 2, by using contracts with banks

and merchants that restrained trade unreasonably, as well as unlawful agreements not to compete with competitors and potential competitors. The Government also alleges that Visa entered into both types of contracts in violation of Sherman Act § 1, 15 U.S.C. § 1. The crux of the complaint is that Visa used de facto exclusive dealing contracts to prevent Visa's rivals in debit from ever having the opportunity to compete effectively, and fashioned customized incentive contracts to stymie market entry by fintech firms.

Visa moved to dismiss the Government's complaint on three grounds. First, Visa argues that the Government's alleged product market is implausible because it excludes other payment networks that, like debit networks, move money between bank accounts. Second, Visa argues that the complaint fails to allege anticompetitive conduct and thus harm to competition because the complaint does not allege that Visa discounted prices for Visa debit to below its costs. Third, Visa contends that the terms of its current contracts disprove and defeat the allegation that Visa agreed with competitors and potential competitors not to compete.

Because Visa requests the premature resolution of factual issues at the pleadings stage, and for the additional reasons explained below, Visa's motion to dismiss is **denied.**

## I. Factual Background

Unless otherwise noted, the following facts are taken from the complaint ("Compl."), ECF No. 1, and are accepted as true for purposes of the present motion to dismiss.[1]

### A. Debit Transactions

Debit transactions draw funds immediately and directly from the consumer's bank account. Compl. ¶¶ 24, 26. Tens of millions of Americans prefer to transact or must transact using debit. Id. ¶¶ 1, 27, 28. A debit transaction involves several actors, including the consumer, the merchant, and their respective banks. Id. ¶ 2. In the debit industry, the consumer's bank is called the "issuer" and the merchant's bank is called the "acquirer." Id. ¶ 4.[2] Debit networks are the intermediaries that facilitate debit transactions. Id. ¶¶ 3-4, 29.

When a consumer pays using debit, the merchant selects a debit network for the transaction and requests payment through its acquirer. Id. ¶¶ 4, 35. The acquirer then sends the consumer's information to the debit network. Id. ¶ 35. Using that information, the debit network asks the issuer for authorization. Id. If the consumer has sufficient funds and

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

[2] Issuers and acquirers may work with processors that connect banks with debit networks. Id. ¶ 30 nn. 1-2. Unless otherwise specified, issuers and issuer processors are referred to together, and acquirers and acquirer processors are also referred to together. Id.

there are no indications of fraud, the issuer places a hold on the funds and sends an authorization over the debit network to the acquirer. Id. At this step, the issuer also deducts an "interchange fee," paid by the acquirer to the issuer for the issuer's services. Id. At the last step, the acquirer sends the authorization to the merchant, who completes the transaction. Id. These steps typically transpire in seconds. See id. ¶ 36.

## B. Debit Networks

To facilitate transactions, debit networks provide consumers with a unique credential that is ready for use at all merchants participating in the network. Id. ¶ 31. Behind the scenes, debit networks facilitate the transfer of funds by providing "rails"—the means through which banks communicate and transfer funds. Id. Debit networks allegedly also provide payment guarantees for merchants, dispute and chargeback capabilities for consumers and issuers, and fraud protections for all parties. Id.

Banks, not debit networks, ultimately move money from consumers to merchants. Id. ¶ 32. But debit networks clear and oversee the interbank settlement process. Id. Each day, debit networks aggregate all transactions for each bank, net out applicable fees, and provide banks with daily settlement reports, which banks then use to transfer funds among themselves. Id.

4

A debit network can process a transaction only where the debit network connects to both the issuer and the acquirer and is accepted by the merchant for the particular transaction. Id. ¶¶ 4, 30, 54. A debit network's desirability and effectiveness therefore depend on the breadth of the network's acceptance and enablement by all participants. Id. ¶ 55. Put another way, debit networks operate in a two-sided market with strong indirect network effects. See ¶¶ 5, 55, 154; see also Ohio v. American Express Co., 585 U.S. 529, 535 (2018) ("Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate."). Indirect network effects benefit incumbent debit networks with widespread enablement by issuers and acceptance by merchants; for smaller debit networks, lack of scale presents a significant barrier to entry. Id. ¶¶ 170-71.

Debit networks generally charge (1) per-transaction network fees to both issuers and acquirers; and (2) fixed network fees to acquirers. Id. ¶¶ 22, 43. List prices for network fees are called "rack rates." Id. ¶ 12. Acquirers pass on at least some network fees to merchants. See id. ¶ 45.

In using debit, acquirers (and thus merchants) incur additional expense because acquirers pay interchange fees to issuers for issuers' services. Id. ¶¶ 44-45. For the largest issuers with $10 billion or more in assets ("regulated

issuers"), the Federal Reserve has capped the interchange fee amount. See id. ¶¶ 44, 52; Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys., 603 U.S. 799, 805 (2024). For smaller, unregulated issuers, "[t]he amount of the fee is set by the payment networks, like Visa and Mastercard." Corner Post, 603 U.S. at 805; Compl. ¶ 44.

### C. Forms of Debit

In the United States, the most common form of debit is the general purpose debit card. See id. ¶ 30. Other forms of debit include alternative rails developed by fintech firms. Id. ¶ 60.

### 1. Debit Cards

Debit cards are issued by issuers that have contracted with debit networks. Id. ¶ 30. When issuing debit cards, issuers select one "front of card" network and place that network's graphic on the front of the card. Id. ¶¶ 4, 34, 38-39. The issuer also chooses which "back of card" networks to enable and may graphically identify those networks on the back of the card. Id. Debit card credentials include a sixteen-digit card number and other security features like the expiration date, card verification value, security chip, and four-digit personal-identification number ("PIN"). Id. ¶ 34.

The following figure illustrates the typical features and graphic design of a debit card:



Id. ¶ 34 Fig. 1.

Four front of card networks operate in the United States: Visa, Mastercard, American Express ("Amex"), and Discover. Id. ¶¶ 40, 53.[3] Visa is the front of card brand for over 70% of debit-card payment volume in the United States. Id. ¶¶ 53, 67. Mastercard comes in at second with around 25%. Id. Amex and Discover comprise the remaining share. Id. In part due to significant switching costs, issuers enter into long-term contracts with either Visa or Mastercard for front of card

---

[3] On May 18, 2025, Capital One acquired Discover. Capital One, Press Release: Capital One Competes Acquisition of Discover, https://investor.capitalone.com/news-releases/news-release-details/capital-one-completes-acquisition-discover, (May 18, 2025).

placement and rarely change their front of card network. Id. ¶¶ 40, 172.

On the back of the card, issuers have more networks to choose from. See id. ¶ 41. Visa and Mastercard each operate an affiliated back of card network: respectively, Interlink and Maestro. Id. Other back of card networks include STAR, NYCE, and Discover's Pulse. Id. ¶¶ 41, 107. Visa and Mastercard debit cards include Interlink and Maestro, respectively, as well as at least one unaffiliated back of card network. Id. ¶ 41.

Back of card networks are often called "PIN networks" because they require PIN entry for transactions where the consumer taps or swipes their card. See id. ¶¶ 41, 56. But PIN networks also offer "PINless" technology, which can process debit transactions without PIN entry. Id. ¶ 56.

PINless technology is not automatically available; the issuer must enable it for particular types of transactions. See id. ¶ 42. Issuers may also decide not to enable PIN networks to process certain types of transactions, such as transactions over a set dollar amount or transactions with weak encryption. See id. ¶ 58. In contrast, Visa and Mastercard are accepted by nearly all United States merchants that accept debit; put otherwise, merchant demand for Visa and Mastercard debit is inelastic. Id. ¶¶ 170-71.

Consumers can use debit cards for purchases at brick-and-mortar stores for "card-present" ("CP") transactions and online for "card-not-present" ("CNP") transactions. Id. ¶¶ 1, 28. Today, CNP debit transactions comprise about half of all debit spending. Id. ¶ 37. That number represents a dramatic increase since 2010 and is still growing. Id.

For CNP transactions, debit card credentials are either entered manually or pulled from a digital wallet. Id. As a result, PIN entry almost never occurs online. Id. Instead, other features like multifactor authentication help secure CNP transactions. Id. Accordingly, if the issuer does not enable PINless transactions, PIN networks are unable to process CNP transactions. See id. ¶¶ 42, 56, 58.

### 2. Fintech Debit

"Fintech debit" refers to alternative debit rails developed by fintech firms. Id. ¶ 60. Like debit card networks, fintech debit networks require both consumer and merchant enrollment and participation. Id. ¶ 117. But fintech debit networks rely directly on the consumer's bank account number, rather than a debit card credential, and store the consumer's bank account number on the network for future use. Id. ¶¶ 61, 108, 113. In that way, fintech debit networks can cut debit card networks out of the transaction. Id. ¶ 108.

In processing a transaction, fintech debit networks communicate with the issuer to authorize and clear the transaction, and then provide settlement services by initiating a payment to the acquirer. Id. ¶ 61. At the final step, fintech debit networks transfer funds using services provided by "interbank payment networks." See id. In addition, fintech debit networks also provide dispute resolution and chargeback capabilities for consumers and issuers, payment guarantees for merchants, and fraud protections for all parties. Id. ¶ 113.

Fintech debit networks can be embedded in different payment solutions, such as digital wallets. Id. ¶¶ 109, 116. Two types of digital wallets exist. Id. ¶ 116. "Staged digital wallets" like PayPal and Cash App enable consumers to pay with preloaded funds or funds pulled from a linked bank account, either directly or using a debit card credential. Id. "Pass-through digital wallets" like Apple Pay and Google Pay transmit payment credentials (such as a debit card number) directly to a merchant's acquirer. Id. The acquirer then uses the passed-through credential to process the payment. Id.

### D. Interbank Payment Networks

Interbank payment networks, like debit networks, transfer funds between bank accounts. See id. ¶¶ 61, 159. In that sense, interbank payment networks are lower-cost alternatives to Visa's debit offering. Id. ¶ 61.

Three examples are Automated Clearing House ("ACH"), Real Time Payment ("RTP"), and FedNow. Id. ¶¶ 61, 115. Offered by The Clearing House or the Federal Reserve system, ACH has been used for decades to facilitate interbank settlement and for recurring fixed payments like disbursements and paychecks. See id. ¶¶ 115, 159. More recently, The Clearing House launched RTP and the Federal Reserve launched FedNow. Id. ¶ 115. Both RTP and FedNow are real-time interbank payment networks that facilitate instantaneous transfers. Id.

Unlike debit networks, however, interbank payment networks do not provide dispute resolution and chargeback capabilities for consumers and issuers, payment guarantees for merchants, and fraud protections for all parties. Id. ¶¶ 152–53, 159. Moreover, ACH requires the consumer to enter and verify bank account and routing information at each merchant. Id. ¶ 159. For merchants, ACH is allegedly more subject to fraud than debit card transactions. Id. In addition, ACH can take several days to settle payment and even longer to make funds available. Id. ¶¶ 115, 159.

## II. Factual Allegations

The Government's allegations against Visa are summarized below.

### A. Recent History

Until the early 2000s, Visa and Mastercard enjoyed exclusive relationships with their respective issuers for both credit cards and debit cards. Id. ¶¶ 48-49. In 2003, those exclusivity agreements were held to be unlawful. United States v. Visa U.S.A., Inc., 344 F.3d 229, 241 (2d Cir. 2003). Related private litigation settled shortly thereafter. Compl. ¶ 49. Pursuant to that settlement, Visa and Mastercard each agreed to provide merchants with the ability to accept the respective brand's debit cards without accepting the brand's credit cards, and vice versa. Id. Between 2006 and 2008, the landscape shifted further as Visa and Mastercard both became independent public corporations. Id. ¶ 50.[4]

Most banks continued to issue only Visa or Mastercard debit cards. Id. Other networks rarely outcompeted Visa and Mastercard for front of card placement because of Visa and Mastercard's unmatched scale of existing merchant relationships. Id. And switching costs prevented Visa or Mastercard from easily displacing the other. Id. Accordingly, debit cards often featured only Visa or Mastercard, leaving merchants with only one routing choice for many debit transactions. See id.

---

[4] Previously, Visa and Mastercard operated as membership associations owned exclusively by member banks. Compl. ¶ 48.

In 2011, pursuant to the "Durbin Amendment,"[5] the Federal Reserve promulgated Regulation II ("Reg II") and thereby transformed the debit market. See id. ¶¶ 8-9, 51; Corner Post, 603 U.S. at 805. To improve routing choices for merchants accepting debit, the Durbin Amendment required each debit card to support at least two unaffiliated networks. Compl. ¶¶ 8, 51. The Durbin Amendment also capped interchange fees paid to regulated issuers. Id. ¶ 52; Corner Post, 603 U.S. at 805. With a no-evasion rule, this interchange cap limited debit networks' ability to incentivize issuers to switch networks, or fully to compensate issuers' switching costs. Compl. ¶ 52.

Effective 2023, the Federal Reserve amended Reg II and clarified that at least one debit network unaffiliated with the front of card network must be enabled for CNP transactions (the "2023 Amendment"). Id. ¶ 71 (referencing Debit Card Interchange Fees and Routing, 87 Fed. Reg. 61217, 61230-32 (Oct. 11, 2022) (codified at 12 C.F.R. § 235.7)). This clarification sought to promote competition in e-commerce among debit networks. Id.

### B. Visa Debit

Visa is thriving. See id. ¶ 63. In 2022, Visa produced global operating incomes totaling $18.8 billion with an

---

[5] Congress passed the Durbin Amendment in 2010 and it became law as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (2010). Compl. ¶ 8. The Durbin Amendment is complementary to the federal antitrust laws. 12 U.S.C. § 5303.

operating margin of 64% globally and an operating margin of 83% in North America. Id. Central to this success, Visa debit in the United States produces Visa's largest source of revenue globally. Id. ¶ 64. Each year, on its United States debit volume, Visa charges over $7 billion in network fees and earns over $5.6 billion in net revenue. Id.

For each debit transaction routed to Visa, the acquirer and the issuer each pays a network fee to Visa. Id. ¶¶ 22, 43. The acquirer also pays an interchange fee to the issuer. Id. ¶ 44. Network fees for Visa debit vary based on the transaction type but are generally lower for issuers than for acquirers, and in most cases, significantly higher than those charged by the PIN networks. Id. ¶¶ 43, 45, 68. In earning these network fees, Visa incurs nearly zero incremental cost for each additional debit transaction routed on the Visa network. Id. ¶ 65. Visa also bears no financial risk for fraudulent debit transactions; the merchant or the issuer bears that risk instead. Id.

In 2012, Visa also began charging each enrolled acquirer a fixed monthly fee, called the "Fixed Acquirer Network Fee" ("FANF"). Id. ¶ 43. Visa subsequently raised the FANF twice. Id. ¶ 87. Visa prices an acquirer's FANF based on factors such as the number of locations the merchant operates and the merchant's volume of CNP transactions. Id. ¶ 43.

## C. Alleged Market Definition

The markets alleged to be relevant are two product markets in the United States: (1) the market for general purpose debit network services and (2) the submarket for general purpose card-not-present debit network services. Id. ¶¶ 149-51.

## 1. Alleged Product Market

The two-sided market for general purpose debit network services allegedly includes "payment products and services" that are accepted at numerous unrelated merchants and "that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account." Id. ¶ 152. To be included, payment networks must offer the four "minimum attributes of debit": (1) a rail that facilitates real-time transactions paid directly from the consumer's bank account; (2) the ability for the consumer or the issuer to dispute and chargeback the transaction; (3) payment guarantees for merchants; and (4) fraud protections for all parties. Id. ¶¶ 152-53, 159. On that basis, the alleged market for general purpose debit network services includes both debit card networks and alternative debit networks, such as fintech debit networks. See id. ¶¶ 152, 156.

Based, however, on the contention that market participants view other payment methods as unsuitable substitutes for debit, the following methods of payment are excluded:

- General purpose credit card network services;

15

- Network services for store cards and other prepaid cards;

- Cash and check payments; and

- Interbank payment networks.

Id. ¶¶ 155, 157–60.

Interbank payment networks are excluded because they allegedly lack three out of the four minimum attributes of debit: the ability for the consumer or the issuer to dispute and chargeback the transaction; payment guarantees for merchants; and fraud protections for all parties. Id. ¶¶ 153, 159. In addition, ACH lacks real-time transaction rails, id. ¶ 115, and RTP is available only for banks, see id. ¶ 61; The Clearing House, RTP, www.theclearinghouse.org/payment-systems/rtp/institution (last visited June 18, 2025) ("RTP Website").

### 2. CNP Submarket

The Government defines the market for general purpose card-not-present debit network services as "a narrower relevant product market included within the broader" product market that primarily services e-commerce transactions. Id. ¶ 161. This "CNP submarket" includes both debit card and fintech debit networks, but again excludes interbank payment networks. See id. ¶ 162.

16

## C. Visa's Alleged Monopoly Power

The Government alleges that Visa possesses monopoly power in the market for general purpose debit network services and the CNP submarket. Id. ¶¶ 164-65, 174-75. For purposes of this motion, Visa does not contest that allegation.

Visa is the front of card brand for over 70% of debit card payment volume. Id. ¶¶ 6, 53, 67, 179. Measured by the percentage of all debit transactions, Visa enjoys a 60% market share in the alleged market for general purpose debit network services, and a 65% market share in the CNP submarket. Id. ¶¶ 6, 66, 164. In each alleged market, Mastercard has less than 25% market share, and no other competitor has more than a single-digit percentage market share. See id. ¶¶ 103, 164. The PIN networks collectively represent approximately 11% of all debit transactions and only 5% of CNP debit transactions. Id. ¶ 103.

The below table summarizes these market share allegations:

| Product Market | Market Share | CNP Submarket | Market Share |
|---|---|---|---|
| Visa | 60% | Visa | 65% |
| Mastercard | 25% or less | Mastercard | 25% or less |
| Other Networks | About 15% | Other Networks | About 15% |
| PIN Networks | 11% | PIN Networks | 5% |

See id. ¶¶ 6, 66, 103, 164.

Visa has retained these market shares allegedly despite imposing new fees (like the FANF) and the promulgation of Reg

17

II. Id. ¶¶ 167, 175. Although Visa's share of debit payment volume dropped from approximately 63% in 2011 to approximately 56% in 2012, the year when Reg II first took effect, Visa regained the lost market share within a few years. Id. ¶¶ 95-96, 167. More recently, in October 2023, Visa converted previously optional fees charged to acquirers for digital commerce services into a mandatory bundled fee, allegedly without a corresponding loss in debit volume. See id. ¶ 175.

Central to Visa's alleged monopoly power, about 45% of Visa CP transactions and an even higher share of Visa CNP transactions cannot be routed to networks other than Visa and are thus "non-contestable." Id. ¶¶ 10, 58, 73, 79. Non-contestable transactions exist because issuers have not enabled PIN networks to process certain transaction types. See id. ¶¶ 58, 92.

### D. Visa's Contracts

With this alleged monopoly power, Visa allegedly coerces merchants, acquirers, and issuers to enter into exclusive dealing contracts with Visa. These contracts, the Government says, amount to de facto exclusive dealing arrangements that violate Sherman Act §§ 1 and 2. Id. ¶¶ 181-92, 198-202.

### 1. Routing Contracts

Visa's routing contracts with merchants and acquirers today cover more than 180 of Visa's largest merchants and acquirers,

18

representing over 75% of Visa's debit volume. Id. ¶¶ 13, 98.
Visa's routing contracts require the merchant or acquirer to
route to Visa 90% to 100% of the merchant or acquirer's eligible
debit transactions. Id. ¶¶ 12, 57, 70-76, 79, 87, 98. In some
cases, Visa also bargains for top position in the routing table,
a ranked list that determines which network a given debit
transaction should be routed to. Id. ¶ 76.

To induce merchant and acquirer enrollment, Visa allegedly
creates an incentive structure that shares Visa's alleged
monopoly profits but punishes noncompliance. See id. ¶¶ 12, 74.
First, Visa charges artificially high rack rates and introduces
fixed fees like the FANF. See id. ¶¶ 12, 79-81, 87. Then, with
routing contracts, Visa offers relief: discounted rack rates and
fixed fee waivers. Id. ¶¶ 78-81, 87. In some cases, Visa adds
credit incentives. Id. ¶¶ 77, 85. But, while providing
concessions with one hand, Visa allegedly extracts the right to
punish noncompliance with the other. Id. ¶¶ 76-78. Pursuant to
Visa's routing contracts, subject only to limited safe harbors,
any volume shortfall gives Visa the right to revert back to rack
rates for all transactions, both contestable and
non-contestable. Id. ¶¶ 76, 78. Additionally, in many cases, any
volume shortfall gives Visa the right to terminate early the
entire contract and claw back any incentives that Visa had

previously paid, including any credit incentives provided under the contract. Id. ¶ 77.

Because of this incentive structure, even some acquirer processors that operate PIN networks have allegedly agreed to routing deals with Visa. Id. ¶ 82. Those contracts allegedly discourage acquirer processors from using PIN networks to compete vigorously against Visa. Id.

Visa's routing contracts with merchants and acquirers allegedly foreclose from competition at least 45% of total debit volume in the United States. Id. ¶ 98. In so doing, Visa's routing contracts allegedly limit routing choice and deprive Visa's competitors of scale. Id. ¶¶ 13, 45, 57–59, 77–78, 98.

### 2. Issuer Contracts

On the other side of the market, Visa enters into long-term contracts with issuers that allegedly impose a variety of restrictions on issuers. See id. ¶¶ 40, 88–94, 172.

With some issuer contracts, Visa places direct restrictions on the placement and enablement of other debit card networks. See id. ¶ 88. For example, Visa's contract with JPMorgan Chase allegedly permits Chase to enable only one unaffiliated PIN network on 90% of Visa debit cards issued by Chase. Id.

With other issuer contracts, Visa allegedly achieves similar results using volume targets. See id. ¶ 89. Included in nearly 1,000 of Visa's issuer contracts, volume targets offer

20

incentives in exchange for the issuer's commitment to grow the issuer's debit volume routed to Visa in line with Visa's overall debit growth in the United States. Id. Volume shortfalls, however, require the issuer to pay significant monetary penalties. Id. ¶¶ 90, 93. In some cases, noncompliant issuers may owe Visa an early termination fee comprised of a multimillion-dollar fixed fee plus a percentage of the benefits the issuer has already earned. Id. ¶ 90. Debit volume targets therefore incentivize issuers not to enable additional networks on Visa debit cards and not to enable existing networks for additional transaction types. Id. ¶ 91.

### 3. Alleged Exclusionary Effects

With issuer contracts on one side, and merchant and acquirer contracts on the other, Visa allegedly foreclosed competition in such a substantial share of the relevant market so as to adversely affect competition. See id. ¶ 100. Reinforced by indirect network effects, Visa's unmatched scale and volume of non-contestable transactions allegedly prevent any rival debit network from competing to earn a meaningful market share. Id. ¶¶ 98-104. Lack of acceptance and usage, in turn, allegedly ensnare rival networks in a vicious cycle that prevents growth, improvement of features, and ultimately, effective competition with Visa. Id. ¶¶ 101, 105, 142.

After the Durbin Amendment became law, smaller debit networks allegedly attempted to outcompete Visa by offering lower fees and improved features. Id. ¶ 104. But Visa's contracts allegedly foreclosed such competition by imposing cliff pricing on merchants, acquirers, and issuers alike. Id. ¶¶ 76, 78, 81, 93. Under Visa's alleged cliff pricing, Visa's prices increase dramatically when volume targets are not met, namely, when transactions are routed to debit networks other than Visa. Id.

To overcome Visa's alleged cliff pricing and win transactions away from Visa, it is not enough for a PIN network to outcompete Visa on the price of per-transaction network fees. See id. ¶¶ 83, 102. The PIN network must also compensate merchants, acquirers, and issuers for the cost of Visa's imposing rack rates on non-contestable volume, as well as any other incentive clawbacks. Id. Moreover, the resulting lack of sufficient transaction data inhibits PIN networks from offering robust fraud protections equivalent to or better than the protections provided by Visa or Mastercard. Id. ¶ 105. Thus, Visa's contracts allegedly make it nearly impossible for PIN networks to win market share away from Visa. Id. ¶¶ 103, 140.

Additionally, Visa's contracts have allegedly thwarted the intended effects of the Durbin Amendment and Reg II. See id. ¶¶ 95-96, 99, 167. For example, in 2023, Chase asked Visa for a

contractual waiver to issue Visa debit cards with both Maestro and Pulse enabled, as required to comply with the 2023 Amendment. Id. ¶ 107. Visa allegedly thought that granting the waiver would increase competition for CNP volume. See id. Taking stock, Visa granted Chase only a short-term waiver. Id. But, with this leverage, Visa allegedly forced Chase to enter into a Visa routing contract. Id.

This strategy was not limited to Chase; as alleged, Visa also strategized to renew other issuer contracts and threatened issuers with monetary penalties and price increases to discourage PINless enablement. Id. ¶¶ 99, 173. With merchants and acquirers, Visa allegedly strategized to secure more volume under routing deals, and to discourage switching by including early termination fees. Id. ¶ 99.

All told, by the end of 2022, at least 75% of Visa's debit volume (and 80% of its CNP debit volume) were allegedly insulated from competition because of Visa's contracts. Id. ¶ 141. That allegedly foreclosed from competition at least 45% of all debit transactions and over 55% of CNP debit transactions in the United States. Id. ¶¶ 19, 140–41.

### E. Alleged Fintech Suppression

The Government also alleges that Visa partners with competitors and potential competitors unlawfully to dissuade competition. Id. ¶ 16. Using its alleged monopoly power, Visa

allegedly offers customized incentives totaling up to hundreds of millions of dollars annually to partners in exchange for agreements not to develop a competing product and not to compete in certain ways. Id. ¶¶ 21, 110-12, 135. In addition, Visa allegedly obtains protections against disparagement, discrimination, and disintermediation. Id. ¶ 112, 135. For these reasons, the Government alleges that Visa's contracts with competitors and potential competitors "amount to a horizontal product market division." Id. ¶¶ 112, 135, 147.

### 1. Staged Digital Wallets

In forming partnerships to stymie threats to Visa debit, Visa allegedly prioritized staged digital wallets. Id. ¶ 121. Starting in around 2016, to prevent such wallets from competing, Visa allegedly threatened to impose a staged digital wallet fee. Id. ¶ 125. In response, all staged digital wallets signed deals with Visa. Id. The alleged examples are PayPal and Square. Id. ¶¶ 119-32.

With PayPal, in 2016, Visa allegedly used the threat of staged digital wallet fees and high rack rates to induce PayPal to enter into an expansive Visa routing contract. Id. ¶¶ 119-22. In around 2015, Visa allegedly also stymied PayPal's entering into partnerships with brick-and-mortar merchants by imposing a restriction on ACH-funded transactions when the PayPal customer had a Visa card in their PayPal wallet. See id. ¶ 123. Visa

relaxed these restrictions in 2021, but allegedly required information sharing to monitor PayPal's product success. Id. In 2022, PayPal and Visa entered into a new ten-year contract that allegedly limits PayPal's incentives and ability to disrupt the market for debit network services. Id. ¶ 124. To this end, Visa allegedly restricts PayPal's in-person ACH-funded transactions to a QR-code model. Id. ¶ 123.

With Square, Visa allegedly entered into a series of contracts that allegedly foreclosed Square from competing aggressively against Visa and prevented Square from developing a fintech debit network. See id. ¶¶ 126-32. When Visa first entered into a contract with Square in 2014, Visa allegedly insisted on the right to terminate for convenience to punish any efforts to compete with Visa. See id. ¶¶ 127-29. In 2016, Visa allegedly threatened termination to prevent Square from launching a new product that would enable users to store preloaded funds. See id. ¶¶ 130-31. More recently, when Square launched Cash App Pay, a consumer-to-merchant payment service, Visa allegedly used the threat of staged digital wallet fees to coerce Square: to route 97% of Cash App Pay transactions to Visa; to preference Visa in signup flow and default settings; and not to steer customers to ACH. Id. ¶ 132.

### 2. Other Fintech Firms

Using incentive-laden contracts, Visa allegedly also guards against disintermediation by other fintech firms. Id. ¶¶ 112, 133, 135. By forming custom partnerships and entering into routing contracts with Big Tech companies like Amazon and Apple, Visa allegedly extracts non-disintermediation and other future commitments from some of Visa's largest merchants. Id. ¶ 135. Visa also benefits by allegedly obtaining control over e-commerce acceptance and online payments flow in the partners' systems. Id. ¶ 134.

Apple is the alleged example. Id. ¶ 118. In response to Apple's threat, Visa allegedly entered into deals whereby Apple agreed: not to develop or deploy payment functionality with the aim of competing with Visa; not to build, support, or introduce payment technologies that disintermediate Visa; not to provide incentives "with the intent of disintermediating Visa or inciting customers to cease using Visa Cards"; and not to steer customers to third-party payment methods such as ACH. Id. ¶ 136. In exchange, Visa allegedly provided Apple with reduced merchant fees and payments that, in 2023, totaled hundreds of millions of dollars. Id.

### F. Effects on Competition

The Government alleges that, by engaging in the conduct described above, Visa harmed competition and innovation in the

26

United States market for general purpose debit network services and the CNP submarket. Id. ¶¶ 138-46. The Government also alleges that Visa's alleged conduct produces no procompetitive benefits that outweigh the anticompetitive effects or that cannot be obtained through less restrictive means. Id. ¶ 147. The Government further contends that Visa's agreements with current and potential competitors are not ancillary to the contracting parties' vertical relationship, but rather, simply divide up the relevant product markets. Id.

### III. Legal Standard

### A. Sherman Act § 1

Section 1 of the Sherman Act forbids "[e]very contract . . . in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Despite this broad language, § 1 "was intended to prohibit only unreasonable restraints of trade." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 98 (1984). Therefore, "[t]o prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506 (2d Cir. 2004). "The overarching standard is whether [the] defendant['s] actions diminish overall competition, and

hence consumer welfare." K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995).

"Some restraints are per se unreasonable"—that is, "under no circumstance will they be held to be lawful." U.S. Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 54 (2d Cir. 2019). "If a restraint is not per se unreasonable, it is analyzed under the rule of reason" to determine whether the procompetitive effects outweigh the anticompetitive effects. See id. at 55.

### B. Sherman Act § 2

Section 2 of the Sherman Act makes it unlawful for a person to "monopolize" or "attempt to monopolize" interstate trade or commerce. 15 U.S.C. § 2. Under § 2, monopoly power means "the power to control prices or exclude competition." United States v. E.I. du Pont De Nemours & Co., 351 U.S. 377, 391 (1956).

To establish monopolization in violation of § 2, the plaintiff must prove that "the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power." Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97 (2d Cir. 1998) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). Hence, § 2 does not outlaw the acquisition of monopoly power through "growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell Corp., 384 U.S. at 570-71. To be found unlawful, "the possession of monopoly power" must be

"accompanied by an element of anticompetitive conduct." Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).

To establish attempted monopolization in violation of § 2, the plaintiff must show that the defendant: "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

Under § 2, courts must avoid "tightly compartmentalizing the various factual components" of the plaintiff's claims and "wiping the slate clean after scrutiny of each." City of Groton v. Conn. Light & Power Co., 662 F.2d 921, 928–29 (2d Cir. 1981) (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)). When aggregated, however, independently lawful acts rarely cause harm to competition. See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 457 (2009). Therefore, the proper inquiry is not whether "there is a fraction of validity to each of [the plaintiff's] claims." City of Groton, 662 F.3d at 928–29. "The proper inquiry is whether, qualitatively, there is a synergistic effect." Id.

### B. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the

complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In particular, a claim brought under the Sherman Act must plausibly (1) define the relevant market and (2) allege conduct in violation of the antitrust laws (3) that harmed competition. See United States v. Microsoft Corp., 253 F.3d 34, 58-59 (D.C. Cir. 2001) (en banc) (per curiam); Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

**IV. Discussion**

Visa's three arguments for dismissal are addressed in turn.

**A. Market Definition**

Visa argues initially that the Government's alleged product market is implausible because it excludes interbank payment networks such as ACH and RTP. Mem. of Law in Support ("Br.") at 12-17, ECF No. 39; Visa's Reply ("Rep.") at 1-3, ECF No. 60. But the Government has alleged several characteristics that plausibly restrict the reasonable interchangeability of use between debit networks and interbank payment networks, and thus a plausible product market.

"To state a claim under either [§] 1 or [§] 2 of the Sherman Act, a plaintiff must plausibly allege that the defendant['s] anticompetitive conduct restricted competition within a relevant market." See Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 338 (2d Cir. 2024). "For antitrust purposes, the concept of a market has two components:

a product market and a geographic market." Concord Assocs., 817 F.3d at 52. Visa's motion to dismiss challenges only the Government's proposed product market.

The relevant product market includes "all products reasonably interchangeable by consumers for the same purposes." United States v. Am. Express Co., 838 F.3d 179, 196 (2d Cir. 2016), aff'd sub nom. Ohio v. Am. Express Co., 585 U.S. at 540. At the pleadings stage, the alleged product market must "bear a rational relation to the methodology courts prescribe to define a market" and include a "plausible explanation as to why a market should be limited" to exclude possible substitutes. Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001).

To discern the boundaries of the relevant product market, courts look to "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). "Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." Regeneron, 96 F.4th at 339; see also du Pont, 351 U.S. at 394-95.

"This is a relatively permissive pleading standard." Regeneron, 96 F.4th at 339. Courts should therefore "hesitate to

grant motions to dismiss for failure to plead a relevant product market." Todd, 275 F.3d at 199–200.

### 1. Reasonable Interchangeability

Visa argues that the alleged product market is implausible because the excluded interbank payment networks perform the same core function as the included debit networks: transferring funds between bank accounts. But Visa places "improper weight on the functional, rather than economic, similarities between" interbank payment networks and debit networks. See Regeneron, 96 F.4th at 338–40. Moreover, Visa improperly devalues the allegation that interbank payment networks lack at least three out of the four alleged minimum characteristics of debit. See Compl. ¶ 159. Evaluated under the established legal frameworks for defining the relevant product market, the complaint alleges plausibly that debit networks and interbank payment networks "are not economic substitutes." See Regeneron, 96 F.4th at 340.

### (a) Hypothetical Monopolist Test

To define the relevant market, courts often apply the "hypothetical monopolist test." Am. Express Co., 838 F.3d at 198. The test "imagin[es] that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market." Id. "If the hypothetical monopolist can impose a SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the

33

proposed market is the relevant market." Regeneron, 96 F.4th at
339. But "if consumers are able and inclined to switch away from
the products in the proposed market in sufficiently high numbers
to render the SSNIP unprofitable, then the proposed market
definition is likely too narrow and should be expanded." Am.
Express Co., 838 F.3d at 199. Additionally, courts considering
"a two-sided market must consider the feedback effects inherent
on the platform." See id. at 200.

In this case, the complaint alleges plausibly that a
hypothetical monopolist could impose a profitable SSNIP in the
proposed product market. This is because demand is plausibly
alleged to be bilaterally inelastic. See Compl. ¶ 155. On the
cardholder side, tens of millions of Americans allegedly prefer
or must rely on debit. Id. ¶¶ 27, 157, 160. Some consumers, for
example, prefer the spending discipline of using only available
funds; others are unable to obtain credit. Id. That creates
inelastic merchant demand because merchants "do not want to risk
lost sales by not accepting many consumers' preferred payment
method." Id. ¶ 155; see also Am. Express Co., 838 F.3d at 197–98
(emphasizing the interdependence between the two sides of a card
payments network). And in debit, where merchants go, acquirers
must follow. See Compl. ¶ 155.

Moreover, it is plausible that the four alleged minimum
attributes of debit sufficiently restrict the cross-elasticity

34

of demand between debit networks and other payment networks such that a hypothetical monopolist could impose a profitable SSNIP on general purpose debit network services. Id. ¶¶ 155, 157–60. The complaint alleges specifically that no other type of payment network offers all four of the minimum attributes of debit: (1) real-time transaction rails; (2) dispute and chargeback capabilities; (3) merchant payment guarantees; and (4) fraud protections. Id. ¶¶ 152–53, 157–60. In particular, the real-time interbank payment networks lack (2), (3), and (4), and ACH lacks all four. Id. ¶¶ 152–53, 155, 159. In addition, RTP is alleged to be available only for banks. See id. ¶ 61; RTP Website.

In response to a SSNIP, consumers might continue to use debit networks over interbank payment networks because consumers are reluctant to give up the ability to charge back fraudulent or defective purchases. Id. ¶ 159. The same may be true of fraud protections. Id. Consumers may also be averse to the additional frictions associated with interbank payment networks (like ACH's account verification and slower processing speed). Id. RTP is allegedly not even available to consumers. See id. ¶ 61; RTP Website.

Likewise, in response to a SSNIP, merchants and acquirers might continue to use debit networks over interbank payment networks because of inelastic consumer demand for debit. Id. ¶¶ 155, 159. Moreover, lack of fraud detection and merchant

35

payment guarantees could increase costs related to fraud and nonpayment; those increased costs might sufficiently offset savings recouped from interbank payment networks' lower fees so as to make switching undesirable. See id.

Although both debit networks and real-time interbank payment networks offer real-time transaction rails, that "does not automatically mean that [the products] compete in the same market." See Regeneron, 96 F.4th at 340. Somewhere across the spectrum of function and price, products divide into separate product markets. See id. at 339-40 (finding plausible the allegation that vials and prefilled syringes "contain[ing] the same medicines" competed in different product markets); Fed. Trade Comm'n ("FTC") v. Tapestry, Inc., 755 F. Supp. 3d 386, 416 (S.D.N.Y. 2024) (collecting cases). Moreover, given other economic factors, even functionally identical products—like brand-name and generic versions of the same drug—can sort into different product markets. Geneva Pharms., 386 F.3d at 496-97. Because the complaint in this case alleges plausibly and with specificity that functional differences between debit networks and interbank payment networks are features that delineate the relevant product market, the Government has alleged a plausible product market.[6]

_____

[6] In arguing to the contrary, Visa relies on inapposite cases. See, e.g., Jacobs v. Tempur-Pedic Int'l Inc., 626 F.3d 1327, 1338 (11th Cir. 2010) (finding that "skimpy allegations" failed to define a plausible product

At bottom, what matters is "reasonable interchangeability in the eyes of consumers." United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), aff'd, 344 F.3d at 244. And the complaint explains plausibly that, in response to a SSNIP on general purpose debit network services, consumers, merchants, and banks would continue to use debit networks rather than to substitute interbank payment networks, despite their limited "real-world functional similarities." See Regeneron, 96 F.4th at 339-40. The complaint therefore alleges plausibly that the market for general purpose debit network services is the relevant product market. See id.

### (b) Practical Indicia

To define the relevant product market, courts also "look to practical indicia of market boundaries to identify whether two products are economic substitutes." Id. at 339. These so-called Brown Shoe factors "can include 'industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" Id. (quoting Brown Shoe, 370 U.S. at 325 & collecting cases). "This list is neither mandatory

---

market); Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1121-22 (9th Cir. 2018) (rejecting proposed submarkets that "omit[ted] many economic substitutes"); Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 706 (S.D.N.Y. 1997) (declining to accept "a relevant product market in a single brand product").

nor exhaustive." Alaska Elec. Pension Fund v. Bank of Am. Corp., 306 F. Supp. 3d 610, 620 (S.D.N.Y. 2018).

In this case, the practical indicia bolster the plausibility of the Government's proposed market. In particular, "industry or public recognition" of the debit market "as a separate economic entity" provides strong support. See Brown Shoe, 370 U.S. at 325. Industry recognition is significant because "economic actors usually have accurate perceptions of economic realities." Todd, 275 F.3d at 205.

Visa's own documents indicate that the payment networks industry distinguishes between debit and other methods of payment. See Br., Ex. 3 at 5, ECF No. 39-3; see also United States v. Google LLC, 747 F. Supp. 3d 1, 113 (D.D.C. 2024) ("Google itself recognizes general search services as a distinct product and separate market."). Similarly, the providers of RTP and FedNow describe their real-time interbank payment networks not as substitutes for debit networks, but rather, as a tool that financial institutions can use to build debit networks. See RTP Website; The Federal Reserve, About the FedNow® Service, www.frbservices.org/financial-services/fednow/about.html (last visited June 18, 2025).

Other practical indicia also support the Government's proposed market definition. See Regeneron, 96 F.4th at 339. Debit is alleged to have peculiar characteristics-the four

38

minimum attributes of debit—that distinguish debit networks from other payment services. Compl. ¶¶ 152-53. Debit networks are also alleged to have distinct customers, including, on the cardholder side, consumers that are ineligible for credit. Id. ¶ 27. In addition, debit networks allegedly set distinct prices by charging network fees, imposing fixed fees on merchants and acquirers, and setting interchange fees for unregulated issuers. Id. ¶¶ 43-44; see also FTC v. Meta Platforms, Inc., 654 F. Supp. 3d 892, 918-19 (N.D. Cal. 2023) (weighing a distinct pricing model in favor of the existence of an antitrust market). Moreover, the complaint alleges that whereas debit networks process a variety of transactions at "numerous, unrelated merchants," interbank debit networks primarily process "recurring fixed payments like mortgage and tuition payments." Compl. ¶¶ 152, 159.

Taken together, the practical indicia alleged in or referenced by the complaint suggest plausibly that debit networks are a distinct type of payment service. Accordingly, the complaint alleges plausibly that debit networks and interbank payment networks "are not economic substitutes." See Regeneron, 96 F.4th at 341.

### 2. Visa's Counterarguments

Visa sees a logical inconsistency in the allegation that fintech debit networks compete with Visa debit, whereas

interbank payment networks, which fintech debit networks use to transfer funds, do not. This argument, however, misapprehends the relevant allegations. The complaint alleges that fintech debit networks use interbank payment networks as "lower-cost alternatives to Visa's debit offering" when transferring funds between banks. Compl. ¶ 61. That only strengthens the complaint's allegation that the end users of debit network services—consumers and merchants—view as reasonable substitutes for Visa only those networks, like fintech debit networks, that provide "the same functionality to consumers and merchants." See id. ¶¶ 60-61, 156. Interbank payment networks do not provide the same functionality as Visa debit because even real-time interbank payment networks lack three out of the four alleged minimum attributes of debit. Id. ¶¶ 152-53, 159. Visa's counterarguments are therefore without merit.

In sum, the Government has alleged a plausible product market. See Regeneron, 96 F.4th at 339-40. "Market definition is a deeply fact-intensive inquiry" that "generally requires discovery," Todd, 275 F.3d at 199-200, and this case is not an exception. Accordingly, Visa's motion to dismiss for failure to allege a plausible product market is **denied**.[7]

―――――――――――

[7] Because Visa does not separately challenge the plausibility of the proposed CNP submarket, the complaint's allegations regarding the CNP submarket likewise survive Visa's motion to dismiss.

## B. Exclusive Dealing Contracts

Visa's second argument is that the complaint fails to allege anticompetitive conduct and thus harm to competition because the complaint does not allege that Visa discounted its prices for Visa debit to below its costs. Br. at 17–20; Rep. at 4–7, 10–11. Advocating for a rule of <u>per se</u> legality, Visa contends that the price-cost test "require[s] the Government to allege that Visa has set prices below its costs, full stop." Br. at 18.

But that argument overlooks all of the other anticompetitive conduct alleged in the complaint. Moreover, Visa's argument misconstrues the gravamen of the complaint. The Government does not allege that Visa violated the Sherman Act by setting prices too low, namely, by using predatory volume discounts; quite to the contrary, the Government contends that Visa's contracts deprived rivals of their ability to compete and thus allowed Visa to charge supracompetitive prices. Gov't's Opposition ("Opp.") at 14, ECF No. 52.

Those allegations show plausibly that the legality of Visa's alleged conduct should be evaluated "under the rule of reason to determine whether the 'probable effect' of such conduct was to substantially lessen competition," rather than merely disadvantage rivals. <u>See</u> <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 269 (3d Cir. 2012) (quoting <u>Tampa Elec. Co. v.</u>

41

Nash. Coal Co., 365 U.S. 320, 328–29 (1961)); Microsoft, 253 F.3d at 69. At this stage, "[t]he price-cost test is not dispositive" because the complaint "do[es] not allege that price itself functioned as the exclusionary tool." See ZF Meritor, 696 F.3d at 269, 281.

### 1. Exclusive Dealing

Under an exclusive dealing agreement, the buyer agrees to purchase specific goods or services only from the seller for a set period of time. Id. at 270. "The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition." Id. (citing United States v. Dentsply Int'l, Inc., 339 F.3d 181, 191 (3d Cir. 2005)). Such conduct can deprive "rivals of the opportunity to achieve the minimum economies of scale necessary to compete." Id. at 271.

Because courts look to the actual effects of exclusive dealing arrangements, the federal antitrust statutes recognize "de facto exclusive dealing claims." See id. at 270 (Sherman Act §§ 1 & 2, Clayton Act § 3); Tampa Elec., 365 U.S. at 326–27 (Clayton Act § 3).[8] Recognizing that exclusive dealing agreements are vertical agreements that can produce many procompetitive

---

[8] But see Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001) (reserving judgment on "whether a § 2 analysis may be neatly imported into a relevant § 1 analysis").

benefits, courts evaluate their legality under the rule of reason. ZF Meritor, 696 F.3d at 271; CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 80 (2d Cir. 1999); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 393–94 (7th Cir. 1984).

To be held unlawful under the rule of reason, an exclusive dealing arrangement must "foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." ZF Meritor, 696 F.3d at 271; Microsoft, 253 F.3d at 69–70. Courts "also analyze the likely or actual anticompetitive effects of the exclusive dealing arrangement, including whether there was reduced output, increased price, or reduced quality in goods or services." Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 403 (3d Cir. 2016); see also MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 183 (2d Cir. 2016) (generally requiring "evidence of changed prices, output, or quality"). But there is no set formula, and courts must "look at the practical effect of [the] exclusive dealing arrangements" in any given case. McWane, Inc. v. FTC, 783 F.3d 814, 834 (11th Cir. 2015).

## 2. The Price-Cost Test

The price-cost test shields genuine price discounts from claims of predatory pricing. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222–24 (1993). When the price-cost test applies, the plaintiff must prove that the

43

defendant's prices "are below an appropriate measure of [the defendant's] costs." Id. at 222.

To avoid chilling procompetitive conduct, courts apply the price-cost test not only to predatory pricing claims, but also to claims alleging that the defendant's actions directed at price itself excluded rivals from the relevant market. See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 325 (2007) (alleged predatory bidding); linkLine Commc'ns, 555 U.S. at 451-54 (alleged price squeeze). Doing so recognizes that "cutting prices in order to increase business often is the very essence of competition," see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986), and that "[l]ow prices benefit consumers regardless of how those prices are set," see Atl. Richfield Co. v. USA Petrol. Co., 495 U.S. 328, 340 (1990).

### 3. Exclusive Dealing and Price

Discounts conditioned on exclusivity have required courts to "grapple[] with the question of when to apply the price-cost test." FTC v. Syngenta Crop Prot. AG, 711 F. Supp. 3d 545, 572-76 (M.D.N.C. 2024) (surveying the case law). In ZF Meritor, the Court of Appeals for the Third Circuit "balance[d] the important concerns the Supreme Court has identified in over-regulating price-cutting schema, and under-regulating exclusive dealing." Id. at 575. The court concluded that "exclusive dealing

arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing." ZF Meritor, 696 F.3d at 281. But the court further held that "the price-cost test may be utilized as a specific application of the rule of reason" in exclusive dealing cases. Id. at 273 (citing Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-63 (8th Cir. 2000)). Doing so is appropriate, the court determined, when "price is the clearly predominant mechanism of exclusion." Id. at 275. Conversely, when the defendant's alleged practices include one or more significant non-price elements of exclusion, the price-cost test's safe harbor need not apply. See id. at 279-81.

After ZF Meritor was issued, other circuit courts of appeal have cited the decision favorably.[9] Moreover, numerous district courts have expressly applied the "the clearly predominant mechanism of exclusion" standard.[10] In this case, the parties both cite ZF Meritor favorably and appear to agree that the ZF

---

[9] See In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 545 F. Supp. 3d 922, 1016-17 (D. Kan. 2021), aff'd, 44 F.4th 959, 987-88 (10th Cir. 2022) (approving of the district court's application of the ZF Meritor standard in a multi-district litigation transferred from the Third Circuit); McWane, 783 F.3d at 834-35 (following ZF Meritor and applying the rule of reason to de facto exclusive dealing arrangements).

[10] See, e.g., Syngenta, 711 F. Supp. 3d at 575; In re Surescripts Antitrust Litig., 608 F. Supp. 3d 629, 642 (N.D. Ill. 2022); In re EpiPen, 545 F. Supp. 3d at 1016-17; In re Remicade Antitrust Litig., 345 F. Supp. 3d 566, 577-80 (E.D. Pa. 2018); Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016).

Meritor standard strikes an appropriate balance between the
price-cost test and the rule of reason applicable to exclusive
dealing claims. Br. 20; Opp. 14-15. The Court therefore
considers whether price is alleged to be the clearly predominant
mechanism of exclusion.

### 4. Sufficiency of Allegations

Under the ZF Meritor standard, the Government has alleged a
plausible exclusive dealing claim under Sherman Act §§ 1 and 2.
To prevail on an exclusive dealing claim brought under § 1, the
plaintiff must show that the defendant's practices amounted to
exclusive dealing arrangements that "foreclose[d] competition in
such a substantial share of the relevant market so as to
adversely affect competition." ZF Meritor, 696 F.3d at 271
(citing Tampa Elec., 365 U.S. at 328). Exclusive dealing
arrangements also violate § 2 when the overall practice
constitutes "willful acquisition or maintenance of [monopoly]
power." Dial Corp., 165 F. Supp. 3d at 34, 36-37. At the
pleadings stage, the defendant's anticompetitive conduct and
resulting harm to competition must be plausibly alleged. See
Twombly, 550 U.S. at 570.

In assessing whether the defendant's actions substantially
foreclosed competition, courts consider the following factors:
(1) significant market power by the defendant; (2) substantial
foreclosure; (3) contracts of sufficient duration to prevent

46

meaningful competition by rivals; (4) likely or actual anticompetitive effects considered in light of any procompetitive effects; (5) whether there is evidence that the dominant firm engaged in coercive behavior; (6) the ability of customers to terminate the agreements; and (7) the use of exclusive dealing by the defendant's competitors. ZF Meritor, 696 F.3d at 271–72 (collecting cases). For purposes of this motion, relying solely on the price-cost test, Visa contests only the fourth factor: likely or actual anticompetitive effects. Thus, to survive Visa's motion to dismiss, the complaint must allege plausibly that Visa's contracts excluded rivals from the relevant market through one or more significant non-price mechanisms. See id. at 275; Syngenta, 711 F. Supp. 3d at 576.

The complaint makes such allegations. The thrust of the complaint is that Visa's loyalty scheme, unfurled through Visa's contracts on both sides of the relevant market, unreasonably restrained competition and grew or maintained Visa's monopoly in debit by excluding rivals through mechanisms linked only indirectly to price. Recognizing its monopoly power and leverage over non-contestable transactions in particular, Visa allegedly increased its rack rates and introduced new fixed fees.[11] See

---

[11] The mere existence of non-contestable volume may be the product of "growth or development as a consequence of a superior product."

Compl. ¶¶ 12, 22, 76-87, 102. Additionally, to grow its
non-contestable debit volume, Visa allegedly induced and
threatened issuers like Chase to disable PIN networks. See id.
¶¶ 88-94, 99, 107, 173. Visa then allegedly used its dominant
position and artificial incentive structure to coerce customers
into exclusive dealing contracts. See id. ¶¶ 198-202; Dentsply,
399 F.3d at 184 (explaining that, "if faced with an 'all or
nothing' choice," customers "may accede to the dominant firm's
wish for exclusive dealing"). These "long-term" contracts
included cliff pricing, clawback provisions, and other penalties
that, in effect, took away the ability of customers to terminate
the agreements. See Compl. ¶¶ 40, 75-79, 90-93; In re
Surescripts, 608 F. Supp. 3d at 646 (explaining that clawback
provisions can "greatly amplif[y] the [loyalty] scheme's
exclusionary effect").

    All told, Visa's loyalty program allegedly foreclosed from
competition at least 45% of all debit transactions and over 55%
of CNP debit transactions in the United States—an amount of
foreclosure sufficient to violate the Sherman Act. See Compl.
¶¶ 19, 140-41; Microsoft, 253 F.3d at 70. Visa's contracts

---

Grinnell Corp., 384 U.S. at 571. But monopoly power, even when
lawfully obtained, may not be wielded to exclude competitors in ways
that have the probable effect of harming the competitive process. See
Dentsply, 399 F.3d at 196; Syngenta, 711 F. Supp. 3d at 576-77. That
general rule is especially important when the defendant "has no true
competitor." See Google, 747 F. Supp. 3d at 144.

allegedly also heightened barriers to entry in a two-sided
market naturally insulated from competition. See Compl. ¶¶ 5,
55, 154; In re Surescripts, 608 F. Supp. 3d at 645 (recognizing
that "[a]chieving critical mass" presents "a barrier to entry
for start-ups in many two-sided markets"); see also Syngenta,
711 F. Supp. 3d at 576-77 (applying the rule of reason where the
alleged monopolists "exacerbate[d] the already high" entry
costs). Such effects, in turn, allegedly prevented PIN networks
from gaining the scale necessary to improve features like fraud
protection, which could lead to increased enablement of PIN
networks and thus competition for debit transactions. See Compl.
¶¶ 101, 105. In sum, the crux of the complaint is not that Visa
used volume discounts to harm rivals, but rather, that Visa used
its dominant position in the relevant market to coerce customers
into exclusive dealing contracts that prevented rivals from
having a chance to compete with Visa.

In this case, the complaint alleges plausibly that Visa's
loyalty program prevented Visa's customers from routing to PIN
networks even when PIN networks offered lower per-transaction
prices than Visa. See Compl. ¶¶ 80-83. In that way, this case is
distinguishable from cases where the defendants merely offered
discounts that encouraged volume shopping but did not prevent
customers from buying from or switching to rival suppliers when
those suppliers "offer[ed] better prices." Cf., e.g., Concord

Boat, 207 F.3d at 1059; Eisai, 821 F.3d at 400, 406; Allied
Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d
991, 997 (9th Cir. 2010).

The complaint also alleges plausibly that Visa
substantially foreclosed the relevant market from competition
from the other front of card networks. Exclusive dealing
arrangements of short duration and easy terminability tend not
to violate the antitrust laws. See CDC Techs., 186 F.3d at 81;
Omega Envt'l., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th
Cir. 1997); Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d
227, 237 (1st Cir. 1983); see also Menasha Corp. v. News Am.
Mktg. In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004)
(recognizing that "competition for the contract is a vital form
of rivalry"). But long-term exclusive dealing arrangements,
especially those that are difficult to terminate, have the
potential to frustrate competition even from equally efficient
or more efficient suppliers. See ZF Meritor, 696 F.3d at 265,
277 (monopolist's market-share contracts lasting at least five
years with every direct purchaser in the relevant market); Duke
Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337,
357 (4th Cir. 2024) (long-term contracts gave incumbent
monopolist the power to offer "blend-and-extend" discount that a
more efficient upstart could not match). In this case, not only
are Visa's contracts alleged to be long-term contracts, Compl.

50

¶¶ 40, 99, 172, but moreover, the two-sidedness of the relevant market amplifies their alleged exclusionary effect. See In re Surescripts, 608 F. Supp. 3d. 645-47; FTC v. Surescripts, LLC, 424 F. Supp. 3d 92, 103-04 (D.D.C. 2020). Any particular merchant and its acquirer cannot easily leave Visa altogether for another front of card network because consumers will continue to seek to use Visa debit cards at the merchant. See Compl. ¶¶ 170-71. In other words, "losing [Visa] as a supplier [is] not an option." See ZF Meritor, 696 F.3d at 278. On the other side, switching costs allegedly prevent issuers from switching easily to other front of card networks like Mastercard, and Reg II allegedly prevents rival networks from using interchange fees to compensate regulated issuers' switching costs. Compl. ¶¶ 52, 172. Taken together, the length of Visa's contracts, the market's structure, and Visa's dominant position in the market suggest plausibly that even other front of card networks are excluded from competition through significant mechanisms other than price. See ZF Meritor, 696 F.3d at 277; Dentsply, 399 F.3d at 193-96; Dial Corp., 165 F. Supp. 3d at 33.

Indeed, the complaint alleges that there has been "paltry penetration in the market by competitors over the years." See Dentsply, 399 F.3d at 194. This has allegedly transpired despite Visa's high rack rates and introduction of new fixed fees—market

features that would normally invite competition and entry. See Compl. ¶¶ 79, 87. But despite the efforts of Visa's rivals to compete on price and features, Visa's exclusive dealing contracts allegedly foreclosed competition before competition could even take place. See id. ¶¶ 19, 104, 140–41.[12] Not even regulatory developments like Reg II and the 2023 Amendment have spurred competition. See id. ¶¶ 95–96, 167, 175. This allegedly has allowed Visa to maintain high operating margins in the United States—an indication of anticompetitive effects. See id. ¶¶ 63–64; Google, 747 F. Supp. 3d at 178.

Therefore, the complaint alleges plausibly that the PIN networks' inability to win transactions away from Visa despite offering lower prices, and Visa's lengthy and substantial foreclosure of a two-sided market to other front of card networks, taken together, indicate that Visa's contracts may have broken the competitive process itself. See MacDermid Printing, 833 F.3d at 187 (noting that "the antitrust laws protect competition, not competitors"). The possibility that Visa's pricing practices and superior network features may have induced merchants and banks to enter into contracts with Visa is "not irrelevant." See ZF Meritor, 696 F.3d at 277. But the

---

[12] The complaint also alleges plausibly that Visa's agreements not to compete with competitors and potential competitors prevented entry and thus aided in Visa's alleged monopoly maintenance. See Google, 747 F. Supp. 3d at 167–68. Visa's alleged agreements not to compete are addressed separately below.

question whether Visa earned exclusivity using volume discounts and superior features, or whether Visa used its monopoly power and other non-price mechanisms to coerce its way into its dominant position, is one that is inappropriate for resolution on a motion to dismiss. See Syngenta, 711 F. Supp. 3d at 579.

Visa allegedly used its monopoly power to force long-term exclusive dealing contracts on its customers. See Dentsply, 399 F.3d at 196; ZF Meritor, 696 F.3d at 283. And merchants and banks alike were allegedly concerned that they would be unable to meet consumer demand at Visa's "punitive rack rates." Compl. ¶¶ 12, 79. Thus, as alleged, Visa's "exclusive agreements pose precisely th[e] kind of threat" that the threat of supply shortages did in ZF Meritor. See In re Remicade, 345 F. Supp. 3d at 580; see also In re Surescripts, 608 F. Supp. 3d at 645–46 (recognizing that a dominant network can use loyalty discounts to cement entry barriers and then "charge supracompetitive prices" that "restrict the market's overall number of connections").

Visa relies on NicSand, Inc. v. 3M Co., where the court applied the price-cost test and affirmed the dismissal of the plaintiff's complaint. 507 F.3d 442, 447 (6th Cir. 2007) (en banc). But NicSand does not help Visa. In that case, NicSand alleged that 3M had taken over NicSand's monopoly in do-it-yourself automotive sandpaper by offering large up-front

payments to retailers in exchange for multi-year agreements to provide exclusive shelf space. Id. at 447-49. But in that case: the retailers demanded exclusivity, not the suppliers, id. at 451-53; NicSand and 3M competed with each other on terms of competition that NicSand had established, id. at 453-58; and the predominant mechanism of exclusion was price competition in the form of up-front payments, see id. at 451-53. In this case, the complaint alleges that: Visa coerced exclusivity on its customers; Visa, as the dominant incumbent network, forced rivals to compete on unfavorable terms; and although Visa's alleged loyalty scheme involved volume discounts, it also relied on significant non-price mechanisms of exclusion. Indeed, the NicSand court noted that antitrust liability might arise if 3M used its retailer contracts "and its current market dominance to establish unreasonable barriers to entry in the future." Id. at 457. The complaint alleges that Visa did just that.

In sum, the complaint alleges plausibly that Visa "use[d] its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice." See ZF Meritor, 696 F.3d at 285. Accordingly, Visa's "characterization of this case as a species of predatory pricing is not persuasive." See In re Surescripts, 608 F. Supp. 3d at 643; see also Duke Energy, 111 F.4th at 354 (declining to apply "specific conduct tests" where the plaintiff alleged "a complex or

atypical exclusionary campaign"). Visa's motion to dismiss based on the price-cost test is therefore **denied**.

### C. Agreements Not to Compete

Visa's final argument is that the terms of Visa's current contracts with Apple, PayPal, and Square disprove and defeat the Government's claim that Visa agreed with competitors and potential competitors not to compete. Br. at 20-25; Rep. at 7-10.[13] But that argument ignores the complaint's allegations about Visa's courses of dealing with Apple, PayPal, and Square. The question whether Visa's partner agreements unreasonably restrain competition, contribute significantly to Visa's alleged monopoly maintenance, or both, is one that cannot be answered at the pleadings stage.

Visa's partner contracts allegedly provide discounts and incentives in a "quid pro quo" manner that "amount[s] to a horizontal product market division" and "unreasonably restrain[s] competition." Compl. ¶¶ 112, 194.[14] These contracts

---

[13] Visa does not specify which claims for relief alleged in the complaint this argument addresses. In any event, this argument raises factual questions that are inappropriate for resolution on a motion to dismiss. See Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012).

[14] The complaint therefore does not make clear whether Visa's partner agreements are alleged to be illegal per se or whether their legality should be determined under the rule of reason. See Compl. ¶¶ 112, 194. "[N]aked restraints of trade" between horizontal competitors "with no purpose except stifling competition" are illegal per se under Sherman Act § 1. United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972). But when the economic impact of an agreement is "not immediately obvious," the restraint should be judged under the rule of

allegedly give Visa the ability to charge partners high rack rates and behavioral fees if the partner begins to compete directly with Visa. Id. ¶¶ 113-37. Visa has allegedly used or threatened to use that ability to punish partners in the past. See id.

Taken together, these allegations suggest plausibly that Visa's contracts with competitors and potential competitors "had an actual adverse effect on competition as a whole in the relevant market." See Geneva Pharms., 386 F.3d at 506-07 (quoting Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993)); see also Anderson News, 680 F.3d at 186, 189 (stressing the importance of factual context in evaluating § 1 claims under Twombly); Starr v. Sony BMC Music Ent., 592 F.3d 314, 323-24 (2d Cir. 2010) (similar). The same allegations suggest plausibly that Visa's contracts work to suppress competition from fintech rivals and to prevent entry by potential competitors, significantly aiding Visa in its alleged monopoly maintenance. See Microsoft, 253 F.3d at 79; Google, 747 F. Supp. 3d at 167-68.

---

reason. See State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886-87 (2007).

    For purposes of this motion, it is unnecessary to resolve that ambiguity in the complaint. Visa's argument fails for an independent reason: in general, factual disputes cannot be resolved on a motion to dismiss.

Visa's focus on its current contracts ignores "the facts peculiar to [its] business, the history of the restraint, and the reasons why it was imposed." See Nat'l Soc. of Pro. Eng'rs v. United States, 435 U.S. 679, 692 (1978). To evaluate properly Visa's contracts with partners, it may be necessary to consider Visa's courses of dealing with its partners. See id. Moreover, the Government contends that, in submitting contracts with partners, Visa failed to attach relevant documents that support the complaint's allegations. Opp. at 22. Disposing of this claim at the pleadings stage therefore "risks depriving the parties of a fair adjudication of the claims by examining an incomplete record." See Chambers, 282 F.3d at 155.

Visa also argues that the challenged contractual clauses, such as anti-steering provisions, are not anticompetitive. This argument, however, overlooks the broader factual context alleged in the complaint. See Anderson News, 680 F.3d at 186; Starr, 592 F.3d at 323-24. Namely, over the past decade, Visa allegedly used financial incentives and termination threats to stymie competition from partners. Compl. ¶¶ 120-37. Moreover, the complaint alleges that Visa coerced partners into contractual restraints that may plausibly bring about anticompetitive effects, such as preferencing Visa in signup flow and default settings. Id. ¶¶ 124, 132. Courts have recognized that such default-setting practices may harm competition, especially in

dynamic and evolving network markets. See Microsoft, 253 F.3d at 75-76; Google, 747 F. Supp. 3d at 172-73.

In short, Visa's third argument raises factual questions that cannot be resolved at the pleadings stage. See Starr, 592 F.3d at 324-25. Visa's motion to dismiss based on the alleged terms of several of its current contracts with partners is therefore **denied.**

### CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, Visa's motion to dismiss the complaint is **denied.**

The Clerk is directed to close ECF No. 37.

**SO ORDERED.**

Dated:    New York, New York
          June 23, 2025

_____
          John G. Koeltl
**United States District Judge**